[No. H036828. Sixth Dist. Mar. 29, 2012.]

MUSTAFA REHMANI, Petitioner, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY, Respondent,
ERICSSON, INC., et al., Real Parties in Interest.

## COUNSEL

Bonagofsky & Weiss, Scott Bonagofsky and Elizabeth R. Weiss for Petitioner.

No appearance for Respondent.

Morgan, Lewis & Bockius, Kathryn M. Dancisak, Melinda S. Riechert and Michael D. Schlemmer for Real Parties in Interest.

## OPINION

**ELIA, J.**—In this proceeding petitioner Mustafa Rehmani seeks a writ of mandate to overturn an order granting summary adjudication to his employer, real party in interest Ericsson, Inc. Rehmani contends that the superior court erroneously dismissed his claims of workplace harassment based on national

origin and religion, violations of the California Fair Employment and Housing Act (FEHA), Government Code section 12940.[1] We agree with Rehmani that triable issues exist as to Ericsson's liability for harassment. We will therefore grant the petition and issue the writ.

*Background*

Petitioner Rehmani, a Muslim born in Pakistan, worked as a system test engineer for Ericsson from February 2007, when Ericsson acquired Rehmani's prior employer, to November 13, 2009, the day he was terminated. During his tenure at Ericsson he had coworkers from at least 12 different countries, including India, China, and Pakistan. Three of those coworkers—Amit Patel, Aneel Choppa, and Ashit Ghevaria—originally were, along with Ericsson, the objects of the underlying lawsuit in this case. Rehmani contends that those three harassed him based on his Pakistani nationality and his Muslim faith, and that his supervisor, Afarin Daftari, took no remedial action when he reported this conduct.

By November 2, 2009, the human resources department (HR) had come to believe that Rehmani had sent an e-mail to a number of Ericsson employees, using Choppa's name. The e-mail contained a spreadsheet of confidential salary information. HR then suspected that Rehmani had also been the one who had sent e-mail to an Ericsson customer disparaging the Ericsson management team. The HR director and the vice-president of engineering decided to interview Rehmani on November 9, using questions to be drafted by November 6.

On November 6, 2009, Rehmani reported to the HR director, Dawn Ehrsam, that he had experienced harassment, in that Ghevaria and other Indian employees had been uncooperative toward him and Ghevaria had humiliated him over technical matters. Between November 9 and 18, he reported additional instances showing lack of support and rudeness from coworkers, particularly Ghevaria. Rehmani also complained that he had suffered "salary discrimination" because his salary was not commensurate with his years of experience, as well as "promotion discrimination" because Indian employees were promoted while he was not.

Rehmani was terminated on November 13, 2009, after Rehmani admitted having sent the prohibited e-mails under his coworkers' names. He filed his

---

[1] All further references to section 12940 are to the Government Code.

complaint the following month, December 11, 2009, naming Ericsson, Patel, Choppa, and Ghevaria as defendants. Of the eight causes of action in the complaint, only the first two were against his coworkers as well as Ericsson: harassment based on national origin and harassment based on religion. The remaining claims against Ericsson were for employment discrimination (by failing to promote and by terminating him) based on national origin and religion, retaliation, failure to investigate and prevent harassment and retaliation, wrongful termination, and unfair business practices.

Defendants moved for summary judgment, or alternatively, summary adjudication. They contended, among other things, that the comments alleged to be harassing did not relate to national origin or religion and could not be considered severe or pervasive. The superior court granted summary adjudication of the first two causes of action, because the undisputed facts "demonstrate that Plaintiff was not subjected to unwelcome harassment based on religion and/or national origin, and/or the harassment did not unreasonably interfere with his work performance by creating an intimidating, hostile, or offensive work environment." The court also granted summary adjudication of the fourth cause of action for discrimination based on religion, but it denied defendants' motion as to discrimination based on national origin—not with respect to the termination of Rehmani, but in the allegation that Ericsson consistently promoted Indians over non-Indians. The court also denied summary adjudication on the remaining claims of retaliation, failure to investigate and prevent discrimination and retaliation, and wrongful termination.

Rehmani then filed this petition for a writ of mandate, seeking immediate relief to foreclose the prospect of duplicate trials should an appeal result in a favorable outcome. This court issued a stay of the trial court proceedings, followed by an order to show cause.

*Discussion*

1. *Writ Review*

An order granting summary adjudication may be reviewed by way of a petition for writ of mandate. (Code Civ. Proc., § 437c, subd. (m)(1).) Appealing from a judgment after trial ordinarily provides an adequate remedy at law for a party aggrieved by an order granting summary adjudication. Writ review may be proper, however, "where a pretrial ruling has summarily disposed of a large portion of the case, while several causes of action remain

for trial." (*Fisherman's Wharf Bay Cruise Corp. v. Superior Court* (2003) 114 Cal.App.4th 309, 319 [7 Cal.Rptr.3d 628].) We grant writ review here to obviate a duplicative expenditure of resources for the courts and the parties, because any reversal of the judgment on appeal would require a second trial on claims that arise out of the same facts and overlap with the issues in those causes of action that have withstood the summary adjudication motion. (*Ibid.*; *Barrett v. Superior Court* (1990) 222 Cal.App.3d 1176, 1183 [272 Cal.Rptr. 304].)

## 2. *Summary Adjudication Principles*

Code of Civil Procedure section 437c, subdivision (f)(1), allows a party to move for summary adjudication "as to one or more causes of action within an action . . . if that party contends that the cause of action has no merit . . . ." "A motion for summary adjudication may be made by itself or as an alternative to a motion for summary judgment and shall proceed in all procedural respects as a motion for summary judgment." (Code Civ. Proc. § 437c, subd. (f)(2).) Accordingly, "[a] summary adjudication motion is subject to the same rules and procedures as a summary judgment motion." (*Lunardi v. Great-West Life Assurance Co.* (1995) 37 Cal.App.4th 807, 819 [44 Cal.Rptr.2d 56].)

"A defendant making the motion for summary adjudication has the initial burden of showing that the cause of action lacks merit because one or more elements of the cause of action cannot be established or there is a complete defense to that cause of action. [Citations.] If the defendant fails to make this initial showing, it is unnecessary to examine the plaintiff's opposing evidence and the motion must be denied. However, if the moving papers establish a prima facie showing that justifies a judgment in the defendant's favor, the burden then shifts to the plaintiff to make a prima facie showing of the existence of a triable material factual issue." (*Intrieri v. Superior Court* (2004) 117 Cal.App.4th 72, 81–82 [12 Cal.Rptr.3d 97].) "A prima facie showing is one that is sufficient to support the position of the party in question." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 851 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

In reviewing an order granting summary adjudication, "we apply the same standard of review applicable on appeal from a grant of summary judgment. [Citation.] Accordingly, ' ". . . we take the facts from the record that was before the trial court when it ruled on that motion. [Citation.] ' "We review

the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained." ' [Citation.] We liberally construe the evidence in support of the party opposing summary [adjudication] and resolve doubts concerning the evidence in favor of that party. . . ." ' " (*Schofield v. Superior Court* (2010) 190 Cal.App.4th 154, 156–157 [118 Cal.Rptr.3d 160], quoting *Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 716–717 [68 Cal.Rptr.3d 746, 171 P.3d 1082].)

3. *Harassment Under the FEHA*

■ Section 12940, subdivision (j), defines "unlawful employment practice" to include harassment in the workplace based on religion or national origin. Under the statute "harassment" in the workplace can take the form of "discriminatory intimidation, ridicule and insult" that is " ' "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." ' " (*Kelly-Zurian v. Wohl Shoe Co.* (1994) 22 Cal.App.4th 397, 409 [27 Cal.Rptr.2d 457], quoting *Harris v. Forklift Systems, Inc.* (1993) 510 U.S. 17, 21 [126 L.Ed.2d 295, 114 S.Ct. 367]; accord, *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 263–264 [100 Cal.Rptr.3d 296].) Moreover, harassing conduct takes place "outside the scope of necessary job performance, conduct presumably engaged in for personal gratification, because of meanness or bigotry, or for other personal motives." (*Reno v. Baird* (1998) 18 Cal.4th 640, 646 [76 Cal.Rptr.2d 499, 957 P.2d 1333].) "Thus, harassment focuses on situations in which the *social environment* of the workplace becomes intolerable because the harassment (whether verbal, physical, or visual) communicates an offensive message to the harassed employee." (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 706 [101 Cal.Rptr.3d 773, 219 P.3d 749].)

■ Whether the conduct of the alleged harassers was sufficiently severe or pervasive to create a hostile or abusive working environment depends on the totality of the circumstances. " 'These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 462 [30 Cal.Rptr.3d 797, 115 P.3d 77], quoting *Harris v. Forklift Systems, Inc., supra,* 510 U.S. at p. 23 [114 S.Ct. at p. 371].) " 'Common sense, and an appropriate sensibility to social context, will enable courts and juries to distinguish between simple teasing or roughhousing . . . and conduct [that] a reasonable person in the plaintiff's

position would find severely hostile or abusive.' " (*Miller v. Department of Corrections, supra,* 36 Cal.4th at p. 462, quoting *Oncale v. Sundowner Offshore Services, Inc.* (1998) 523 U.S. 75, 81–82 [140 L.Ed.2d 201, 118 S.Ct. 998]; accord, *Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 283 [42 Cal.Rptr.3d 2, 132 P.3d 211].) As in sex-based harassment claims, "[t]he plaintiff must prove that the defendant's conduct would have interfered with a reasonable employee's [fn. omitted] work performance and would have seriously affected the psychological well-being of a reasonable employee and that [he or she] was actually offended." (*Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 609–610 [262 Cal.Rptr. 842]; accord, *Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 130 [87 Cal.Rptr.2d 132, 980 P.2d 846].)

■ An employer is required to "take all reasonable steps to prevent harassment from occurring," and the failure to do so is itself unlawful. (§ 12940, subds. (j)(1), (k).) "When the harasser is a nonsupervisory employee, employer liability turns on a showing of negligence (that is, the employer knew or should have known of the harassment and failed to take appropriate corrective action)." (*Roby v. McKesson Corp., supra,* 47 Cal.4th at p. 707; see § 12940, subd. (j)(1).) Whether in this case Rehmani's employer failed to take appropriate steps to curb the verbal abuse he allegedly suffered is the primary issue Rehmani seeks to have restored by our overturning the summary adjudication order.

## 4. *Petitioner's Complaint*

Because it is the pleadings that circumscribe the issues presented in a summary judgment or summary adjudication proceeding, we first examine the allegations of Rehmani's complaint as they relate to the first and second causes of action, for harassment based on national origin and religion, respectively. Only these two claims are before us in this proceeding, and only against Ericsson, as summary adjudication in the individual defendants' favor is no longer challenged.[2] Accordingly, the focus of our inquiry is Rehmani's allegation that Ericsson management failed to ameliorate the hostile work environment that existed as a result of the "abuse" he personally suffered from Patel, Choppa, and Ghevaria, and the invidious climate in which non-Indian employees were treated at work.

In his complaint Rehmani generally alleged that Patel, Choppa, and Ghevaria, all Indian, were frequently rude, dismissive, and hostile toward him

---

[2] Rehmani named Choppa, Patel, and Ghevaria as real parties in interest in his petition. In his "Reply to Preliminary Opposition" and his "Reply to Return," however, he refers only to Ericsson as the real party in interest. He also does not question the assertion in Ericsson's return that the three individual employees are no longer defendants in the lawsuit.

because he was a Pakistani and a Muslim. At first the "hostility" of these three took the form of unwillingness to help him with his projects. But it became more severe and "overtly discriminatory" following the November 2008 attacks in Mumbai, India, by Pakistani terrorists. Rehmani further alleged that management had disregarded his complaints about this behavior.

In February 2009 Patel approached Rehmani to ask him what was going on in Pakistan and Afghanistan. According to the complaint, Patel "then said that Pakistan and Afghanistan need[ed] to be bombed and wiped out because of all the terrorist activity there and because it was spreading to India." Rehmani alleged that he reported this remark to his manager, director Afarin Daftari, who promised to speak to Patel about it but did not do so.

In April 2009, when Rehmani asked Patel for assistance with a task, Patel allegedly said, "You're not going to blow me up, right?" Rehmani reported this incident to Daftari, who advised Rehmani to consider it a joke and "not worry about it." When Rehmani insisted that she speak to Patel, Daftari said that she would talk to Patel's manager, but Rehmani did not know whether she ever did so.

In May 2009 Choppa, a software development manager, allegedly approached Rehmani and asked, "What is going on in Pakistan? It is a messed up country and it is creating a mess in the region and in India. There is lots of terrorism. Why don't you people do something about it?" Rehmani pointed out that he had nothing to do with terrorism in Pakistan, and that he was "very sad about the incidents in India, and that he hoped that peace could be restored to the region." Rehmani also mentioned that he was a Canadian citizen working on obtaining his United States citizenship. Choppa, however, "merely rolled his eyes at [Rehmani] and walked away." Rehmani did not report the incident to Daftari right away, he said, because her reactions to his previous complaints had been so negative; but when he next saw Daftari in the break room, he told her about Choppa's comments. The director allegedly shook her head and told Rehmani "in an exasperated and harsh tone" that she did not want to hear his complaints and that he should not worry about it.

Rehmani also complained about being "humiliated and harassed" by Ghevaria in front of other coworkers. While friendly with his Indian coworkers, when Rehmani asked for help, Ghevaria would yell at him and say he had no time for him.

On September 11, 2009, Rehmani took a sick day from work. Peter Kim, another coworker, used Alex Yunerman's computer to announce by e-mail that there were some Indian treats in the break room for Rehmani's birthday. When some of the employees went to the break room, Patel allegedly told

them that Rehmani was out "celebrating 9/11 and planning terrorist attacks." Ghevaria sent Rehmani e-mail wishing him happy birthday and on the following Monday wished him happy birthday in person. Rehmani answered the e-mail by speculating that it must be a joke, because his birthday was not until May 15. Rehmani warned Yunerman, Ghevaria, and Kim not to make "this type of joke to anyone," because it could be turned into the basis of a lawsuit for discrimination. Yunerman and Kim later apologized to Rehmani, and Kim explained that it was Patel's idea to send the e-mail.[3] Rehmani stated in his declaration that the e-mail and jokes made him feel "very stressed out, humiliated, and physically ill at the workplace." His complaint to Daftari and two other managers had no effect.

Rehmani's first cause of action was based on section 12940, subdivision (a), of the FEHA: harassment by Ericsson, Patel, Choppa, and Ghevaria due to his national origin. He alleged that a reasonable person of Pakistani origin would have found the work environment to be hostile or abusive. He suffered "extreme and severe mental anguish and emotional distress" resulting from this "severe and/or pervasive" conduct, and he sought both general and punitive damages as well as injunctive relief. The second cause of action was identical to the first, except that the harassment was alleged to have been based on Rehmani's Muslim faith.[4]

### 5. Sufficiency of Ericsson's Showing

Because Patel, Choppa, and Ghevaria are no longer the subjects of Rehmani's challenge in this writ proceeding, Ericsson must establish that Rehmani will be unable to show not only a hostile work environment but also the company's failure to respond with appropriate corrective action to his reports of mistreatment by his Indian coworkers. In support of their motion defendants argued that they were entitled to summary adjudication of the harassment claims because the incidents Rehmani described were (1) only "a few isolated statements over several years of working together, primarily about politics, and not harassment of [Rehmani] because of his religion or national origin" and (2) not so severe or pervasive as to constitute a hostile work environment. Ericsson further argued, and maintains in this proceeding, that it promptly investigated the only complaints Rehmani made.

---

[3] It is undisputed that Rehmani and Kim were "[v]ery good friends."

[4] The remaining causes of action, which are not before us in this proceeding, were for discrimination based on national origin, discrimination based on religion, retaliation, failure to investigate and prevent harassment and retaliation, wrongful termination, and unfair business practices. Rehmani generally complained that he was not promoted despite good performance and was terminated for pretextual reasons.

Ericsson supported its motion as to Choppa by asserting that the claim against that defendant was premised solely on the conversation about terrorism, in which Choppa declared that Pakistan was a "messed up country" and asked why Rehmani and others did not do something about it. Rehmani responded that there was other conduct that created a hostile work environment, including teasing him about promotions he knew Rehmani would not secure because Daftari "did exactly what her Indian Line Managers told her to do." Rehmani further asserted that Choppa acted "in concert" with others to create a hostile work environment; but he did not identify the specific evidence that supported this theory. He did, however, state in his declaration that he reported the "teasing" incident in June 2009 to Daftari, who harshly dismissed his complaint and suggested there was something wrong with him.[5]

Amit Patel's suggestion that the country should be "wiped out," could, like Choppa's remark, be interpreted either as an angry response to political disputes in the Middle East or as hostility toward Rehmani based on his Pakistani background. Patel explained his attitude by pointing out to Rehmani that the unrest in Afghanistan and Pakistan was affecting all the neighboring regions, including India. But Patel's joke about Rehmani blowing him up, the alleged joke about Rehmani being at home celebrating 9/11 or planning an attack, and Patel's alleged harassment of other non-Indian employees could, taken together, convince a jury that this conduct was part of a hostile work environment to which Rehmani was subjected at Ericsson. Rehmani reported the blowing-up remark to Daftari, who said she would speak with Patel's manager, but he "never received any indication" that she followed through. Rehmani also overheard Patel disparaging some of their Chinese coworkers, referring to them generally as "Chinkoos."

Rehmani's complaints about Ashit Ghevaria mostly pertained to Ghevaria's angry, disrespectful treatment of non-Indian engineers. Although Ericsson persists in the assertion that this evidence is immaterial because the alleged behavior did not specifically target the classification to which he belonged, Rehmani's underlying grievance is directed toward not only the Indian employees' disparaging comments about Pakistanis, but also the expression of their general attitudes toward non-Indians, which created the hostile working environment that Rehmani claims seriously affected his work performance and psychological well-being. In any event, Rehmani also asserted that "at various times" during 2009 Ghevaria became increasingly hostile whenever Rehmani asked for technical help, yelling at him to go away and staring

---

[5] According to Rehmani's declaration, "Ms. Daftari closed her eyes, shook her head, and then turned to me and said with an exasperated and harsh tone that she did not want to hear any more from me about my complaints. She said that I should stop worrying about it, asked me why this was only happening to me, and said that there was something wrong with me. She then walked away from me, out of the break room."

at him with an "extremely angry look" until Rehmani went away. In his declaration Rehmani stated that Ghevaria "did not act this way toward his Indian coworkers when they asked him for assistance."

Ghevaria's behavior might be attributed to Ghevaria's temperament, Rehmani's approach in soliciting help, residual friction from past encounters, work pressures, or simply a personality clash between the two; but those are questions for a jury, not the court, to determine.

Addressing the issue of whether it took corrective action when Rehmani complained of harassment, Ericsson offered evidence of the following: (1) Choppa, Patel, and Ghevaria were all coworkers, not managers of Rehmani and (2) he did not mention harassment to John Neese, the vice-president of engineering, in two meetings with him around August of 2009. When Rehmani did assert this complaint on November 6, 2009, he did not say it was due to his being Pakistani or Muslim.

Based on her investigation, the HR director, Dawn Ehrsam, concluded that there was no evidence of discrimination or harassment based on national origin or religion. She noted that Ghevaria treated two Caucasians and two Asians well, along with five Indians. Those whom he treated "negatively" were nine employees, none of whom was Indian. This evidence is insufficient to establish as an undisputed fact that no discriminatory treatment or harassment of non-Indians by Ghevaria had occurred. (Cf. *Miller v. Department of Corrections, supra,* 36 Cal.4th at p. 466 [widespread sexual favoritism in the workplace can constitute sexual harassment against the nonfavored employees]; *Roby v. McKesson Corp., supra,* 47 Cal.4th at p. 708 ["there is no basis for excluding evidence of biased personnel management actions so long as that evidence is relevant to prove the communication of a hostile message"].)

The 9/11 birthday incident came to the attention of Ericsson supervisors when Rehmani copied Daftari and two other managers on his e-mail message in which he warned his coworkers not to "make this type of joke to anyone." On November 10, 2009, in the course of investigating Rehmani's complaints, Daftari told both Ehrsam and John Neese, the vice-president of engineering, that after Rehmani protested that the 9/11 invitation was inappropriate, she talked to both him and Peter Kim. She said she assured Rehmani that this was not acceptable and that she "would remind the team that this type of behavior is not professional and should be avoided in the future." In a subsequent interview on December 11, 2009, she told Ehrsam that she in fact did speak to the other managers to "make sure everyone [knew] this is not OK." She said Rehmani "seemed fine about it," although he did comment "that this could be a problem and perceived as discrimination." She "asked if he was OK and he say [sic] yeah." In other conversations with Rehmani,

Daftari added, she made sure that he was okay, and she "did not get the feeling from him that he was upset about it." Daftari suggested to Ehrsam during her interview that she "thought after all the apologies it was a done deal and we can move on. I think that was my mistake."

In the December interview, however, Daftari also told Ehrsam that she had never heard any inappropriate comments, and she added that this was "the first time [she had] heard about these thing[s]." She did recall Ghevaria loudly yelling at Rehmani during a meeting, but they stopped the meeting when Rehmani claimed harassment. Rehmani had previously accused Ghevaria of not cooperating with him. Daftari described Rehmani as a "complainer" and a "whiner," who would "nag about someone" whenever he found her. She denied that Rehmani had ever called the workplace a hostile environment, and she did not believe that Rehmani was treated differently because of his national origin or religion. Daftari also submitted a declaration in support of the summary judgment motion, but it addressed only Rehmani's claim of discrimination in promotions and the e-mail exchanges over the birthday incident. Her statement that Kim "confirmed that he had apologized" over the e-mail invitation was excluded as hearsay, but Rehmani himself testified that both Kim and Yunerman had apologized.

A jury might agree with Ericsson that none of the alleged acts by Choppa, Patel, or Ghevaria was based on Rehmani's national origin or religion, and such a conclusion would refute the assertion of Ericsson's liability in the first two causes of action. Or a jury might determine that Ericsson was not liable for the hostile work environment Rehmani allegedly experienced because Daftari adequately responded to Rehmani's complaints about Ghevaria and others. But considering these employees' conduct in the overall context of Rehmani's allegations of hostility by Indian employees toward non-Indians, we cannot determine as a matter of law that the evidence supplied by Ericsson establishes that Rehmani will not be able to convince a trier of fact that he experienced a hostile environment and that his reports of mistreatment were ignored by his supervisor. His claim that he suffered emotional harm, physical illness, and loss of his ability to do his work effectively has not been challenged by Ericsson.

■ Ericsson is correct that actionable harassment " 'cannot be occasional, isolated, sporadic, or trivial[;] rather the plaintiff must show a concerted pattern of harassment of a repeated, routine or a generalized nature. . . .' " (*Aguilar v. Avis Rent A Car System, Inc., supra,* 21 Cal.4th at p. 131; *Thompson v. City of Monrovia* (2010) 186 Cal.App.4th 860, 877 [112 Cal.Rptr.3d 377].) But Rehmani offered evidence of a larger picture than just a few interpersonal squabbles. His declaration, together with testimony from

coworkers, suggests rudeness, taunting, and intimidation from Indian engineers toward their non-Indian colleagues.[6] Rehmani's evidence in support of his discrimination claims—notably Ericsson's favoritism toward Indian engineers in hiring, promotions, salary increases, and work assignments and the managers' practice of assigning non-Indian employees to tasks that help the Indian employees look impressive—may also be relevant in proving a hostile workplace.[7] (See *Roby v. McKesson Corp., supra,* 47 Cal.4th at p. 709 [though distinct, "discrimination and harassment claims can overlap as an

---

[6] Abish Ghimire, an Ericsson test engineer from Nepal, submitted a declaration in opposition to summary judgment. Ghimire stated that several of his Indian coworkers at Ericsson, including Ghevaria, were hostile toward him and other non-Indian engineers and treated them as "slaves." Ghevaria not only was rude and curt toward them, but eventually indulged in "outright yelling and physical intimidation," ordering them to perform work for him and on one occasion calling Ghimire a profane name in Hindi. Ghevaria also openly complained when projects were given to Chinese-American engineers, "whom he and other Indian engineers referred to openly as 'Chinkoos.' " Ghevaria said that " 'Chinkoos are too slow' " and that the projects they were assigned should be given to Indian engineers instead. In their depositions, both Amer Mushtaq and Farooq Khaliq said they had seen Ghevaria yell at non-Indian coworkers, but not at Indians. Amit Patel also referred to his Chinese-American colleagues as "Chinkoos," who were "totally useless" and should be replaced with Indians. Ghimire's manager, Prasenjit Banerji, "did absolutely nothing that [Ghimire] could see to stop Ghevaria and Patel from talking in this way."

[7] In December 2009, during the investigation, Ehrsam interviewed several employees, including Abish Ghimire. He believed that he was "denied opportunities for advancement that were given instead to Indian employees." The "Chinese group" had expressed the same feeling. Ghimire's own manager, Prasenjit Banerji, an Indian, consistently promoted only Indian employees in his group and nominated only Indians for "Engineer of the Month." In 2008 Banerji refused to hire a Chinese-American for a position on his team, explaining that "[Chinese people] don't speak good English and they do not step up. And they also create problems with Indians. It is easier to work with Indians because they are loyal to Indians and they will not create any problems." In 2009 Banerji subsequently refused even to interview a Vietnamese-American engineer applying for an open position, because "Indians could do a better job."

In his December 2009 interview, Amer Mushtaq refused to express his opinion about whether Indian employees treated other Indians better than non-Indians. He pointed out that "[t]his is a bad economy and there are not jobs out there," so he and others were "afraid to talk." But he did admit that he believed Indian employees were given better projects. And in his deposition, he expressed the opinion that his contributions were less valued than those of his Indian coworkers, that his own manager as well as Daftari favored Indians over non-Indians, and that the "promotion and work-assignment system" was discriminatory in favor of Indians against non-Indians.

Stacey Wang agreed that Indian employees tended to get better work assignments, even though non-Indian employees were equally qualified for them. Simon Yang had expressed to HR his belief that Afarin Daftari did not provide equal opportunity to everyone in her group and that in making decisions she relied heavily on her managers, who favored Indians over non-Indians. Farooq Khaliq recalled a conversation in which he agreed with others that his own manager treated non-Indians differently; sometimes the Indian managers would pull non-Indian workers off a project to help the other Indian managers "to make them look good." It appeared that Indian managers preferred to hire Indian contractors, recommended mostly Indian subordinates for recognition, and gave Indians the most visible projects.

evidentiary matter"].) Nor is it inconceivable that he could prove that he suffered "extreme and severe mental anguish and emotional distress" which was reasonable under the circumstances presented.

There is no question that Ehrsam conducted an investigation of Rehmani's November 2009 complaint of harassment. The essence of Rehmani's claim, however, is that he protested multiple times to his *supervisor*, Daftari, about unfair treatment by Choppa, Patel, and Ghevaria. Rehmani admitted that he did not use the word "discrimination" or "harassment" in reporting his coworkers' misconduct. That fact may be significant in defeating Rehmani's effort to show that the harassment was based on his national origin or religion; but we cannot say that in the overall context of the social environment at Ericsson that he will be unable to demonstrate that his non-Indian status was a major basis of the antagonism he experienced.

### Conclusion

Whether an employee was subjected to a hostile work environment is ordinarily one of fact. (*Nazir v. United Airlines, Inc., supra*, 178 Cal.App.4th at p. 264.) Having independently reviewed the evidence supplied by both parties, we cannot conclude that Rehmani will be unable to establish that he experienced harassment at work, for which Ericsson is liable. While Rehmani's case may be too weak to withstand the scrutiny of a jury at trial, at this stage of the litigation we cannot say as a matter of law that the evidence he wishes to adduce is insufficient *in the aggregate* to establish a claim for harassment based on national origin. The trier of fact at the upcoming trial thus should be permitted to determine either that Rehmani's claims have merit or, instead, that his interpersonal difficulties at work were unrelated to Indian sentiment toward non-Indian coworkers—or alternatively, that his complaints to Daftari were insufficient to trigger an investigation into harassment within the meaning of the FEHA. Rehmani's claim of harassment based on religion may be even less tenable; but considering the current international climate of tension between Muslims and non-Muslims and that factor's interaction with relations between various countries (including Pakistan and India), we cannot regard this cause of action as independent of the evidence related to national origin.

### Disposition

Let a peremptory writ of mandate issue directing the respondent court to vacate its order granting summary adjudication of the first and second causes of action and enter a new order denying the motion as to real party in interest

Ericsson. Petitioner shall have costs in this original proceeding. The stay of proceedings in the superior court will terminate upon finality of this opinion in this court.

Rushing, P. J., and Walsh, J.,* concurred.

---

*Judge of the Santa Clara Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.