Filed 2/28/14  Martinez v. County of San Bernadino CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| AURELIO MARTINEZ,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>COUNTY OF SAN BERNARDINO et al.,<br><br>    Defendants and Respondents. | G049091<br><br>(Super. Ct. No. CIVDS 917155)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of San Bernardino County, David Cohn, Judge.  Affirmed.

Aurelio Martinez, in pro. per.; and Bradley Ray White for Plaintiff and Appellant.

Wagner & Pelayes, Risa S. Christensen and Tristan G. Pelayes, for Defendant and Respondent.

\*        \*        \*

Plaintiff Aurelio Martinez, an employee with defendant San Bernardino County's Sheriff's Department, sued the department and the County of San Bernardino alleging several causes of action under the California Fair Employment and Housing Act. (Gov. Code, § 12900 et seq.; FEHA; all further undesignated statutory references are to this code.) The superior court entered judgment for defendants after granting their motion for summary judgment. Plaintiff appeals from the judgment. Finding no error, we affirm.

FACTS AND PROCEDURAL BACKGROUND

The department hired plaintiff in 2001 as a crime scene specialist (CSS). In 2004, plaintiff and Kim Branson were promoted to CSS II. The crime scene investigation (CSI) unit's supervisor, George Yankovich, appointed plaintiff as the unit's training officer and assigned Branson to handle administrative duties.

Plaintiff's training methods drew complaints from some coworkers and trainees. Defendants assert the complaints included accusations he was demeaning and overly critical toward females and that he delayed calling them to respond to crime scenes, thereby creating the impression the women lacked punctuality. Yankovich refused to admonish or counsel plaintiff on these matters. Ronald E. Cochran, a captain with the department who oversaw the CSI unit, learned of the complaints. Over a period of several years, both Cochran and lab director Craig Ogino met with plaintiff in an effort to resolve the personnel issues.

In 2006, because of low morale in the CSI unit, Cochran retained an outside consultant to investigate the issues. After interviewing everyone in the unit, the consultant submitted a report that made several recommendations. One proposal focused on the unit's training program. The report suggested periodically rotating the personnel

2

conducting the training. "The training program has suffered somewhat . . . due to its association with one person, CS[S]II Martinez. Mr. Martinez has spearheaded the program development" and "[t]he program is widely perceived as his program – subject to his personal whims and preferences. Mr. Martinez also has struggled with his ability to connect effectively with all trainees and other staff. Many described hi[m] as 'thorough', 'conscientious', 'detailed-oriented', 'meticulous', and 'patient.' Others see these characteristics in less positive reflections . . . . No one questioned his hard work and dedication. He was also viewed by everyone as extremely competent. The main problems stemmed from communication and training style. . . . [I]t is very likely that he needs some help with coaching and training approaches." A second proposal recommended hiring a new supervisor for the unit.

Yankovich was removed as the unit's supervisor. But Cochran retained plaintiff as its trainer and encouraged him to improve his working relationship with other employees in the unit.

Plaintiff and Branson each applied for the open supervisor position, but the department hired Rick Dysart, a prior county employee then working as the lead crime scene investigator for a local police department instead. Defendants presented evidence that Dysart had significant experience in the crime scene investigation field. Plaintiff disputed this claim, but the evidence he cited was either excluded or failed to contradict defendants' claim. In 2007, Dysart, with Cochran's support, rotated the duties of plaintiff and Branson, placing him in charge of administrative duties and Branson in charge of training.

In early 2008, after receiving reports plaintiff might be using county vehicles without authorization, management installed security cameras. The cameras recorded plaintiff entering the unit's lab after hours when he was neither on duty nor responding to a crime scene and taking car keys. This evidence resulted in the initiation

3

of both criminal and internal affairs investigations against plaintiff. He was placed on administrative leave for two weeks, told not to be in the lab unless he was on duty, and removed from the unit's on-call rotation.

The criminal investigation terminated in October 2008 without charges being filed against plaintiff. The next month, plaintiff filed a complaint with the California Department of Fair Employment and Housing. Plaintiff alleged he had suffered discrimination based on his sex, religion, race, and national origin or ancestry. The adverse actions cited included harassment, denial of a promotion, and retaliation. Shortly thereafter, the Department of Fair Employment and Housing issued plaintiff a right to sue notice. He brought this lawsuit in December 2009.

The internal affairs investigation continued into early 2010 and resulted in substantiated allegations of both misusing county vehicles and insubordination for violating the order not to enter the lab after hours. Initially, plaintiff received a demotion to a CSS I. But because the departmental policy had extended the Public Safety Officers Procedural Bill of Rights (§ 3300 et seq.) to CSI unit employees, and that act requires an investigation be completed within one year (§ 3304, subd. (d)), the demotion was later rescinded. However in October 2010, plaintiff received a letter of reprimand.

Plaintiff acknowledged some tension existed in the CSI unit. When a position opened in the department's Coroner's Division, he was transferred to that division. Plaintiff admitted having previously applied unsuccessfully for the position of deputy coroner investigator, but denied defendants' claim that he agreed the current transfer resolved the unit's conflicts. However, when asked during his deposition about the unsuccessful attempt to transfer to the department's firearms unit, plaintiff explained he thought it would "alleviate tension in the unit" and "would be a good thing for everybody."

4

Before the transfer became effective, plaintiff was ordered to complete all outstanding reports. A unit employee returned a report to plaintiff for corrections. Defendants claim plaintiff refused to make the corrections before his transfer. Plaintiff disputes this assertion, claiming he did make the necessary changes to the report. Nonetheless, a second internal affairs investigation was commenced.

Defendants moved for summary judgment, arguing the purportedly adverse actions cited by plaintiff were taken for legitimate business purposes and he could not establish a nexus between those actions and any discriminatory intent, motive, or retaliatory purpose. Plaintiff's opposition to the motion included his own declaration and portions of depositions from several witnesses. The trial court granted the motion after sustaining defendants' objections to numerous portions of plaintiff's declaration and parts of the deposition testimony he submitted as part of his opposition.

DISCUSSION

1. *Introduction*

"Because this case comes before us after the trial court granted a motion for summary judgment, we take the facts from the record that was before the trial court when it ruled on that motion. [Citation.] '"We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained."' [Citation.] We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party. [Citation.]" (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037.)

In FEHA actions, "California has adopted the three-stage burden-shifting test established by the United States Supreme Court . . . ." (*Guz v. Bechtel National, Inc.*

5

(2000) 24 Cal.4th 317, 354.)  This approach requires the plaintiff "to establish a prima facie case of [an unlawful employment practice]. . . .  [¶] If the plaintiff meets this burden, '"'the burden shifts to the defendant to [articulate a] legitimate nondiscriminatory reason for its employment decision. . . .' . . . "'"  [¶] . . . [I]f the defendant presents evidence showing a legitimate, nondiscriminatory reason, the burden again shifts to the plaintiff to establish the defendant intentionally [engaged in an unlawful employment practice] against him or her.  [Citation.]  The plaintiff may satisfy this burden by proving the legitimate reasons offered by the defendant were false, creating an inference that those reasons served as a pretext for [the unlawful employment practice].  [Citation.]" (*Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 159-160.)

"A defendant's summary judgment motion '"slightly modifies the order of these . . . showings."'  [Citation.]  Consequently, the [defendant] ha[s] the initial burden to either (1) negate an essential element of [the plaintiff's] prima facie case [citation] or (2) establish a legitimate, nondiscriminatory reason for [the adverse action].  [¶] '[T]o avoid summary judgment [once the employer makes the foregoing showing], an employee . . . must offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in [an unlawful employment practice].'  [Citation.]" (*Wills v. Superior Court, supra,* 195 Cal.App.4th at p. 160.)

"In discrimination cases, proof of the employer's reasons for an adverse action often depends on inferences rather than on direct evidence. . . .  [E]ven though we may expect a plaintiff to rely on inferences rather than direct evidence to create a factual dispute on the question of motive, a material triable controversy is not established unless the inference is reasonable.  And an inference is reasonable if, and only if, it implies the

6

unlawful motive is more likely than defendant's proffered explanation. [Citation]" (*Cucuzza v. City of Santa Clara* (2002) 104 Cal.App.4th 1031, 1038.) Also "'[s]peculation cannot be regarded as substantial responsive evidence.' [Citation.] In order to raise an issue as to the employer's credibility, the employee must set forth specific facts demonstrating '"such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence.'"' [Citation.]" (*Ibid.*)

### 2. First Cause of Action – Retaliation

Plaintiff's first cause of action alleged defendants retaliated against him. He asserts as protected activity his complaints over Dysart's decision to rotate the CSI unit's duties between him and Branson and his expressions of concern over quality control issues in the unit. He also cites the actions taken after the department commenced its investigation of his alleged misuse of county vehicles.

Section 12940, subdivision (h) declares "[i]t is an unlawful employment practice" "[f]or any employer . . . to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." (See *Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1003.) "[T]o establish a prima facie case of retaliation . . ., a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz v. L'Oreal USA, Inc., supra,* 36 Cal.4th at p. 1042.)

Plaintiff failed to establish his disagreement with the change in his duties and his expressions of concern about quality control constituted protected activity under

7

FEHA. The Act's retaliation provision "encompasses a broad range of protected activity. An employee need not use specific legal terms or buzzwords in opposing discrimination. [Citation.] Nor is it necessary for an employee to file a formal charge. [Citation.]" (*Rope v. Auto-Chlor System of Washington, Inc.* (2013) 220 Cal.App.4th 635, 652, fn. omitted.) But "case law and FEHA's implementing regulations are uniformly premised on the principle that the nature of activities protected . . . *demonstrate some degree of opposition to or protest of the employer's conduct* or practices based on the employee's reasonable belief that the employer's action or practice is unlawful. [Citation.]" (*Id.* at pp. 652-653, italics added.)

Thus, courts have recognized that "complaints about personal grievances or vague or conclusory remarks that fail to put an employer on notice as to what conduct it should investigate" (*Yanowitz v. L'Oreal USA, Inc., supra,* 36 Cal.4th at p. 1047) or "a mere request—or even repeated requests—for an accommodation, without more" (*Rope v. Auto-Chlor System of Washington, Inc., supra,* 220 Cal.App.4th at p. 652), do not constitute protected activity under FEHA. Federal decisions are to the same effect. (*Barber v. CSX Distrib. Servs.* (3d Cir. 1995) 68 F.3d 694, 701-702 ["letter to Human Resources complain[ing] about unfair treatment in general and express[ing] . . . dissatisfaction with the fact that someone else was awarded the position . . . does not constitute the requisite 'protected conduct' for a *prima facie* case of retaliation"]; *Lewis v. City of Fresno* (E.D.Cal. 2011) 834 F.Supp.2d 990, 1003 ["neither Plaintiff's email" concerning disparate treatment in scheduling overtime assignments that allegedly violated department policy "nor his informal grievance were protected activities under FEHA"]; *McKinney v. Am. Airlines, Inc.* (C.D.Cal. 2009) 641 F.Supp.2d 962, 979, fn. 18 [complaints that another employee is "'causing trouble among staff members' and that [the plaintiff] felt harassed by [the employee] . . . do not constitute protected conduct"].)

8

Further, defendants presented evidence that the other adverse employment actions plaintiff alleges were taken against him, i.e., placing him on administrative leave and barring him from both on-call duty and entering the crime lab after hours, resulted from the investigation triggered by video surveillance evidence suggesting he misused county vehicles. Plaintiff cites to evidence that one employee could use another employee's number to fuel a vehicle. But management's investigation of him arose from video surveillance showing he took county vehicle keys after hours when he had no reason to be on site.

Plaintiff also argues the policy limiting employee use of county vehicles for personal reasons lacked clarity. Apparently, a sheriff's department employee could use a county car for personal reasons when on call or with a supervisor's permission. Granted, the district attorney's office believed the policy was too vague to justify a criminal prosecution. But it does not follow plaintiff's behavior prohibited the initiation of an internal investigation and imposition of punishment for substantiated misconduct. Plaintiff did not present evidence that other employees engaged in the same behavior but only he was singled out for punishment. While he claims he had authorization to use county vehicles, there was no supporting evidence for this assertion.

Defendants concede the initial demotion of plaintiff violated the Public Safety Officers Procedural Bill of Rights, but the demotion was rescinded and he was returned to his status as a CSS II. "'[S]everal federal courts have stated: "The [employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. [Citations.] . . . "'" (*Wills v. Superior Court, supra,* 195 Cal.App.4th at p. 160.)

Plaintiff is correct in asserting the letter of reprimand issued to him also constituted a form of punitive action under the Public Safety Officers Procedural Bill of

9

Rights. (§ 3303; *Otto v. Los Angeles Unified School Dist.* (2001) 89 Cal.App.4th 985, 996-997.) But he has not shown issuance of the letter of reprimand resulted from any "protected activity." To the contrary, defendants presented evidence the letter of reprimand arose from a negotiated settlement in a civil service proceeding over pay issues. They noted plaintiff, "represented by his union representative, and counsel enter[ed] into negotiations with the Sheriff's Department" that resulted in a mutual agreement plaintiff "signed off" on whereby he recovered his previous pay rate "but a letter of reprimand stay[ed] in [his] file." Plaintiff did not appeal the decision, thereby failing to exhaust his administrative remedy.

Finally, plaintiff's subsequent transfer to the coroner's division was the result of management's concern over an apparent employee conflict within the CSI unit. Plaintiff acknowledged tension existed in the unit and testified at his deposition that he had previously sought a transfer to relieve it. Further, not only did plaintiff retain his same status and pay after the transfer, he has not shown it occurred because of any protected activity on his part.

*3. Second Cause of Action – Harassment*

Under FEHA it is "an unlawful employment practice" "[f]or an employer . . ., because of race, religious creed, color, national origin, [or] ancestry, . . . to harass an employee . . . ." (§ 12940, subd. (j)(1).) Plaintiff's second amended complaint alleged he was harassed "due to . . . his (a) sex; (b) race (Hispanic); (c) religion (Catholicism); (d) national origin/ancestry," plus his protests against discrimination, retaliation, and his filing of the FEHA complaint. But the pleading contains only conclusory assertions of "ongoing, abusive, belittling, humiliating, and debilitating conduct, speech and commentary directed at, or about [p]laintiff," plus "threats,

10

undeserved criticisms, and negative 'attitude' and demeanor (manifested verbally, physically, and by mannerisms)."

During the summary judgment proceedings, four incidents were identified as the basis for plaintiff's harassment claim: (1) In mid-2008, personnel in the CSI unit caught a lizard and named it "Luis"; (2) a female trainee complained that plaintiff's training program was too long and strict; (3) plaintiff testified he overheard the same woman make comments to the effect "'[t]his is a woman's job'" and "[w]omen are more meticulous and detailed than men"; and (4) plaintiff complained to a supervisor about the "use[ of] inappropriate language and profanity in the workplace."

""""In determining what constitutes 'sufficiently pervasive' harassment, the courts have held that acts of harassment cannot be occasional, isolated, sporadic, or trivial, rather the plaintiff must show a *concerted pattern of harassment of a repeated, routine or a generalized nature*. [Citation.] . . . " [Citation.]'" (*Brennan v. Townsend & O'Leary Enterprises, Inc.* (2011) 199 Cal.App.4th 1336, 1347.)

Taken as a whole, these disparate and isolated incidents, occurring over a span of several years, do not support a claim of severe or pervasive harassment. A claim for harassment under FEHA "focuses on situations in which the *social environment* of the workplace becomes intolerable because the harassment (whether verbal, physical, or visual) communicates an offensive message to the harassed employee." (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 706.) "Whether the conduct of the alleged harassers was sufficiently severe or pervasive to create a hostile or abusive working environment depends on the totality of the circumstances." (*Rehmani v. Superior Court* (2012) 204 Cal.App.4th 945, 951.) """"Common sense, and an appropriate sensibility to social context, will enable courts and juries to distinguish between simple teasing or roughhousing . . . and conduct [that] a reasonable person in the plaintiff's position would find severely hostile or abusive."' [Citations.] . . ." (*Id.* at pp. 951-952.) Thus a

"'plaintiff must prove that the defendant's conduct would have interfered with a reasonable employee's . . . work performance and would have seriously affected the psychological well-being of a reasonable employee and that [he or she] was actually offended.' [Citations.]" (*Id.* at p. 952.)

The cited incidents occurred over a period of years after plaintiff was elevated to CSS II. They clearly represent the """occasional, isolated, [and] sporadic""" conduct that will not support an harassment claim. (*Brennan v. Townsend & O'Leary Enterprises, Inc., supra,* 199 Cal.App.4th at p. 1347.) What's more, plaintiff asserted the female trainee's complaint about his training methods was offensive simply because he *believed* the comment was *possibly* directed at his gender. Whenever he complained about the off-color language his supervisor would remind staff to refrain from using inappropriate language. Finally, the trial court sustained an objection to the sole evidence plaintiff cited to dispute defendants' assertion he had no valid reason to believe giving an Hispanic name to the lizard constituted harassment or discrimination against him. Even if plaintiff was offended by this conduct, nothing in the record indicates use of the name "Luis" was directed at him.

Plaintiff cited to the testimony of others in support of his harassment cause of action. But the only relevant testimony contradicts his claim. Randolph Beasley described the women in the CSI unit as being "[s]tandoff-ish," but "polite" and "[b]usinesslike" in conversations with plaintiff. Beasely also testified he thought plaintiff was harassed by the crime lab's management, but when asked for details he could not think of anything other than "what [plaintiff] communicated to [him]."

Thus, plaintiff failed to show a triable issue of material fact exists on his harassment claim.

*4. Third Cause of Action – Discrimination*

The amended complaint alleged defendants discriminated against plaintiff "on the basis of his sex, race and/or national origin/ancestry, and/or religion . . . ." Each of these categories qualifies as a protected status under FEHA. Subdivision (a) of section 12940 declares it is an unlawful employment practice "[f]or an employer, because of the race, religious creed, color, national origin, ancestry, . . . sex, [or] gender . . . to refuse to hire or employ the person or . . . to discriminate against the person in compensation or in terms, conditions, or privileges of employment." "While a complainant need not prove that [a discriminatory] animus was the sole motivation behind the challenged action, he must prove by a preponderance of the evidence that there was a 'causal connection' between the employee's protected status and the adverse employment decision." (*Mixon v. Fair Employment & Housing Com.* (1987) 192 Cal.App.3d 1306, 1319.)

In his opening brief, plaintiff argues material issues of fact exist concerning whether defendants employed discriminatory hiring and promotional practices and whether they discriminated against him in their investigations of alleged workplace violations and their implementation of the adverse employment actions arising from the investigations. The record fails to support these claims.

Plaintiff acknowledged in his deposition that he did not suffer any discriminatory treatment "when [he] was hired." As for promotions, he also admitted being one of two persons promoted to CSS II and that the CSI unit supervisor named him as the unit's training officer, a position he held for several years. Plaintiff does claim defendants gave females preference in hiring, but when deposed he admitted having no knowledge of the ratio of male to female applicants for CSI unit or crime lab jobs and could think of only one occasion where the CSI unit hired a woman over a man who he *believed* was more qualified.

13

Other than his application for the CSI unit's supervisor position, plaintiff testified he unsuccessfully applied for three other positions with the sheriff's department. He interviewed for one slot (deputy coroner), but was not chosen. His applications for two others (criminalist-firearms, criminalist-DNA) were rejected because he lacked the necessary qualifications. At his deposition, plaintiff testified he did not believe his rejection for these positions resulted from his race, gender, or religious beliefs.

Plaintiff did claim his failure to be chosen as the CSI unit supervisor resulted from a discriminatory animus. He asserted Dysart was chosen because "[h]e looks different than myself, different ancestry, background, [and] color." But plaintiff acknowledged having no knowledge about Dysart's academic background or work experience. Rather, plaintiff merely testified he "was, in [his own] opinion, a more qualified candidate."

In response, defendants relied on the deposition testimony of Ogino, the crime lab's manager. Ogino stated that he concluded Dysart was the best choice for the supervisor's position because Dysart "had . . . more experience," having worked previously for the crime lab as well as "the lead crime scene investigator" for a local police department. According to Ogino, Dysart's qualifications included the "number of homicides he's been to, the training he received while he was at the sheriff's [lab] as well as Redlands PD, his communication skills, [and] his ability to lead others . . . ." Ogino acknowledged plaintiff may have more formal education than Dysart, but "[y]ou can't just look at education alone. . . . [I]t's more important that th[e] supervisor can communicate well and get others to follow . . . ."

This record fails to demonstrate a triable issue of fact concerning whether the decision to choose Dysart as supervisor resulted from any discriminatory animus. "[T]he fact an employee is the member of a protected class and has demonstrated triable issues concerning the appropriateness of the adverse action taken does not so readily

14

demonstrate a discriminatory animus that it is alone sufficient to establish the fact of discrimination or alone sufficient to avoid summary judgment. [¶] . . . 'Rather, the [employee] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," [citation], and hence infer "that the employer did not act for . . . [the asserted] non-discriminatory reasons." [Citations.]'" (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1005.) The foregoing conflicts in the evidence fails to satisfy this standard.

Further, as discussed at length above, defendants presented evidence the adverse employment actions taken against plaintiff during and after the criminal and internal affairs investigations were based on both video surveillance suggesting he misused county vehicles and his admission he violated the order not to be in the crime lab after hours. Plaintiff failed to present any evidence overcoming defendants' claim these actions were the result of legitimate, nondiscriminatory concerns over violations of the department's vehicle use policy and a superior's direct order.

Thus, we conclude the trial court properly found plaintiff failed to raise a triable issue of material fact on his third cause of action.

*5. Fourth and Fifth Causes of Action*

The fourth and fifth counts of plaintiff's amended complaint alleged defendants failed to take all reasonable steps to prevent the occurrence of the harassment and discrimination he allegedly suffered and, in fact, aided abetted "the discriminatory acts and/or omissions about which [he] complains . . . ." On appeal, plaintiff argues the trial court erred in granting summary judgment on these counts because he "has laid out evidence sufficient to demonstrate that triable issues of fact exist as to

15

whether . . . [defendants] are guilty of unlawful harassment or discrimination . . . ." Since we have concluded plaintiff's substantive claims lack merit, we find these auxiliary counts must fail as well.

## DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.


RYLAARSDAM, J.

WE CONCUR:


O'LEARY, P. J.


FYBEL, J.

16