Filed 8/12/14  Montejano v. County of Los Angeles CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| RAQUEL MONTEJANO, | B250007 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. BC479469) |
| COUNTY OF LOS ANGELES, | |
| Defendant and Respondent. | |

APPEAL from a judgment and an order of the Superior Court of Los Angeles County, Rolf Michael Treu, Judge.  Affirmed in part; dismissed in part.

Michael P. Calof for Plaintiff and Appellant.

Peterson Bradford Burkwitz, Avi Burkwitz and Gil Burkwitz for Defendant and Respondent.

# I.  INTRODUCTION

Plaintiff, Raquel Montejano, appeals from an April 29, 2013 judgment entered after the trial court granted summary judgment in favor of defendant, County of Los Angeles.  Plaintiff argues the trial court erred in granting summary judgment on her claims for sexual harassment, breach of settlement agreement, retaliation and failure to accommodate.  In addition, plaintiff challenges the trial court's award of attorney fees to defendant.  We affirm the April 29, 2013 judgment.  We dismiss plaintiff's appeal of the attorney fee award because we lack jurisdiction to review the order.

# II.  BACKGROUND

## A.  First Amended Complaint

On April 20, 2012, plaintiff filed a first amended complaint alleging causes of action for:  verbal sexual harassment; breach of the Equal Employment Opportunity Commission settlement agreement; retaliation; and denial of reasonable accommodation. On July 16, 2009, plaintiff was hired by defendant's probation department (the department) as a contract program auditor.  In January 2010, she was reassigned to the department's contract services office.  From February 16 through April 2010, another contract program auditor, Juanita Guerrero, sexually harassed plaintiff.  Ms. Guerrero grabbed a laser tool from a co-worker, Manuel Campos, and aimed it at his crotch.  Next, Ms. Guerrero allegedly pointed the laser tool toward plaintiff and stated, "Now Raquel's pussy."  On another occasion, Ms. Guerrero allegedly stated in a loud voice to plaintiff: "What is wrong with your throat?  It's all from that deep throating you did all weekend." Ms. Guerrero's statement was heard by other department employees including Araceli Hernandez who was in the office sitting near plaintiff.  Ms. Hernandez was Ms. Guerrero's and plaintiff's supervisor.  Ms. Hernandez allegedly took no action and remained silent.  In March or April 2010, Ms. Guerrero allegedly said loudly to plaintiff,

2

"Ha, ha, [h]a, [h]a, negra Raquel" (the black girl, Raquel). Ms. Guerrero made this statement while plaintiff was walking with Ms. Hernandez. Again, Ms. Hernandez allegedly took no action. On a fourth occasion, Ms. Guerrero sent plaintiff an unsolicited e-mail, which stated: "Driving in the rain is like having sex doggie style. One slip and you can really [mess] up someone's rear end. Please drive safely today." Plaintiff alleged Ms. Guerrero's conduct created a hostile work environment.

In September 2010, plaintiff spoke to Ms. Hernandez and Sandra Torres. Ms. Torres is Ms. Hernandez's supervisor. Plaintiff said she was going to file a complaint with Dewitt Roberts, the department's acting deputy director. In October 2010, plaintiff filed a complaint with Mr. Roberts about the incidents with Ms. Guerrero. In December 2010, plaintiff met with Ms. Torres. Plaintiff told Ms. Torres about Ms. Guerrero's deep throating comment. In response to plaintiff's verbal sexual harassment complaint, Ms. Torres apologized. Ms. Torres stated she assumed "things were fine" because Mr. Roberts had told her to leave plaintiff alone.

On March 23, 2011, plaintiff filed discrimination complaints with the Department of Fair Employment and Housing and the Equal Employment Opportunity Commission. On May 27, 2011, plaintiff received a right to sue letter from the Department of Fair Employment and Housing. On July 12, 2011, the County of Los Angeles Office of Affirmative Action Compliance sent a letter of determination in response to plaintiff's complaint. The letter stated the department had violated defendant's equal employment opportunity policies.

On June 29, 2011, plaintiff, defendant, and the department entered into a settlement agreement drafted by the Equal Employment Opportunity Commission. Plaintiff alleged under the settlement agreement she was to be laterally reassigned and trained as a program/contract analyst in the contract and grants management division. Plaintiff alleged defendant breached the settlement agreement by not training her and not giving her meaningful working assignments.

On January 20, 2012, plaintiff filed a second discrimination complaint with the Department of Fair Employment and Housing and the Equal Employment Opportunity

3

Commission. Plaintiff alleged she was reassigned to the contracts and grants division on June 6, 2011. She was denied adequate training and assignments to perform her duties as a contract analyst. Plaintiff received a warning letter on July 28, 2011. She also received a reprimand letter on August 4, 2011. On September 14, 2011, she received a notice of reassignment termination, which allegedly breached the terms of the settlement agreement. On September 15, 2011, plaintiff requested a reasonable accommodation, which was denied on September 28, 2011. Plaintiff alleged she was the subject of retaliation by management because she filed two complaints for discrimination and retaliation.

### B. Defendant's Summary Judgment Motion

#### 1. Procedural History

On December 7, 2012, defendant moved for summary judgment, or in the alternative, summary adjudication. Plaintiff filed her opposition on February 6, 2013. Defendant filed a supplemental reply on March 8, 2013.

#### 2. Undisputed Facts

The parties agree on the following undisputed facts. Plaintiff worked for the department in the contract monitoring office from July 2009 to January 2011. Plaintiff's direct supervisor was Ms. Hernandez. From July 2009 to February 2010, plaintiff had no problems at work. While assigned to the contract monitoring office, plaintiff never received any write-ups, warnings or reprimand letters. Also, plaintiff was never suspended or demoted while assigned to the contract monitoring office.

Starting in February 2010, plaintiff heard inappropriate comments from Ms. Guerrero. Those comments bothered plaintiff. On one occasion, Ms. Guerrero allegedly aimed a laser pointer at plaintiff's crotch and said, "Now Raquel's pussy."

Another male employee was present and Ms. Guerrero pointed the laser pointer at his crotch before aiming the device towards plaintiff. Plaintiff dashed out of the room before the laser was aimed at her crotch. Another incident involved a comment made by Ms. Hernandez concerning a water bug that was caught in front of Ms. Torres's office. When two co-workers went to dispose of the bug in the women's bathroom, Ms. Hernandez joked: "Hey, don't put it in there. It's going to go . . . up our ass." On another occasion, Ms. Hernandez was present when Ms. Guerrero told plaintiff: "What's wrong with your throat? It's from all that deep throating you did all weekend." Plaintiff testified Ms. Guerrero and Ms. Hernandez laughed at the comment and it "seemed like they got some sort of kick" out of the statement.

In another incident, Ms. Guerrero allegedly stated in Spanish, "Ha, ha, [h]a, [h]a negra Raquel" (the black girl, Raquel). On another occasion, Ms. Guerrero allegedly played a voicemail she had received on her cell phone. The voicemail was played for plaintiff and another co-worker. The voicemail joke contained the word "nigger" which was offensive to plaintiff.

Ms. Guerrero also sent plaintiff a text message outside of work which stated: "Driving in the rain is like having sex doggie style. One slip and you can really [mess] up someone's rear end. Please drive safely today." Plaintiff did not know whether the text message was sent to her specifically or to a group of recipients. Plaintiff admitted it was common for co-workers to send out group text messages about social topics as opposed to work-related issues.

Plaintiff alleged she was retaliated against beginning on February 16, 2010, and continuing until January 3, 2011. Ms. Hernandez allegedly treated plaintiff differently than her co-workers. The retaliatory actions included: holding back assignments; Ms. Hernandez reviewed plaintiff's assignments last; plaintiff was required to go to Ms. Hernandez's office for these reviews; and Ms. Hernandez accused plaintiff of being uncooperative when plaintiff did not arrive for office meetings in a timely manner. In April 2010, Ms. Hernandez allegedly threatened to write up plaintiff for no reason. Plaintiff reported the threat to Ms. Hernandez's supervisor, Ms. Torres. Ms. Hernandez

5

stated it was a joke and was chastised by Ms. Torres for the joke. Ms. Torres then assured plaintiff there was no basis for a write-up.

In October 2010, plaintiff filed a complaint with the Los Angeles County Office of Affirmative Action Compliance concerning her sexual harassment allegations. In January 2011, plaintiff was temporarily transferred to the fiscal office while defendant investigated her allegations. The purpose of the move was to separate plaintiff from the three individual--Ms. Guerrero, Ms. Hernandez and Ms. Torres. These were the three individuals named in plaintiff's complaint.

In March 2011, plaintiff filed a complaint with the Equal Employment Opportunity Commission. Subsequently, plaintiff and defendant engaged in a mediation conducted by the Equal Employment Opportunity Commission. As a result of the mediation, the parties entered into a settlement agreement on June 22, 2011. The settlement agreement was signed by plaintiff and Mr. Roberts, the department's acting deputy director.

Under the terms of the settlement agreement, plaintiff agreed to waive her right to file any claims regarding her pre-June 2011 allegations in exchange for a transfer to the contracts and grants office. Paragraph 1 of the settlement agreement provides: "In exchange for the promises by [defendant], [plaintiff] agrees not to institute a lawsuit under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), the Equal Pay Act ("EPA"), the Age Discrimination in Employment Act of 1967, as amended ("ADEA"), or the Americans with Disabilities Act of 1990, as amended ("ADA") based on the allegations in the above-referenced EEOC charge of discrimination."

Paragraph 4 of the settlement agreement states, "[Defendant] agrees that there shall be no discrimination or retaliation of any kind against [plaintiff] as a result of filing this charge or against any person because of opposition to any practice deemed illegal under Title VII, EPA, ADEA, or ADA as a result of filing this charge, or for giving testimony or assistance or for participating in any manner in an investigation, proceeding, or hearing under the aforementioned Acts." Paragraph 7, subdivision (f) provides, "[Defendant] assures [plaintiff] that her performance evaluation for the current

6

performance cycle shall not be adversely affected due to the fact that she was assigned to perform work outside her normal duties and below her skill level from January to the beginning of June 2011." The parties further agreed plaintiff would be reassigned to the contracts and grants division effective June 6, 2011, to perform the duties of program analyst. Plaintiff admitted that circumstances relating to her employment could change and she could leave the contracts and grants division.

Defendant agreed to keep confidential plaintiff's discrimination charge. Paragraph 7, subdivision (c) of the settlement agreement provides, "[Defendant] shall remove any references to the events giving rise to this discrimination charge from [plaintiff's] personnel file." Paragraph 7, subdivision (d) of the settlement agreement further states, "[Defendant] assures [plaintiff] that matters related to her complaint to the Office of Affirmative Action Compliance and her discrimination charge with EEOC shall be held in strictest confidence." Paragraph 6 of the settlement agreement provides: "The parties agree that the government is authorized to investigate compliance with this agreement. This agreement may be specifically enforced in court by the government or the parties, and may be used as evidence in a subsequent proceeding in which any of the parties allege a breach of this agreement." Plaintiff acknowledges she was advised to consult with an attorney. Paragraph 8 of the settlement agreement states: "[Plaintiff] acknowledges that she has been advised to consult with an attorney and has been given a reasonable time to consider the Agreement before signing."

In addition, on June 20, 2011, plaintiff signed a supplemental release to the settlement agreement. Paragraph 2 of the supplemental release states: "In exchange for the promises made by [defendant] contained in the EEOC Settlement Agreement, [plaintiff] agrees to withdraw from consideration by any state or federal agency or court of law or other government entity, including, but not limited to, the EEOC, the Department of Fair [E]mployment and Housing (DFEH), or the Los Angeles County Office of Affirmative Action Compliance (OAAC), any charge or complaint of discrimination or other claims relating to illegal discrimination, which are now pending on [plaintiff's] behalf against [defendant], its officers, agents or employees." Paragraph 3

7

of the supplemental release adds: "[Plaintiff] will not institute or cause to be instituted any action in state or federal court, or before any state, local or federal government entity arising from or attributable to any alleged unlawful practice of the [defendant], its officers, agents or employees arising from or attributable to the above-referenced EEOC Charge, or OAAC Complaint." In her deposition, plaintiff stated she was not bound by these provisions because defendant allegedly breached the settlement agreement.

From June to September 2011, plaintiff worked in the contracts and grants division. Her direct supervisor was Daniel Sahagun. On July 25, 2011, plaintiff had a meeting with the division's manager, Latasha Howard, who is Mr. Sahagun's direct supervisor. Ms. Howard instructed Mr. Sahagun to follow up on plaintiff's concerns regarding her duties and assignments. On July 26, 2011, Mr. Sahagun met with plaintiff at her cubicle. He informed plaintiff he was aware of her concerns and would schedule a private meeting to discuss her duties and assignments in more detail. Plaintiff sent an e-mail to Ms. Howard and Mr. Sahagun after he left her cubicle expressing concern as to why a private meeting was necessary. Plaintiff questioned why her assignments could not be discussed in her cubicle similar to how Mr. Sahagun discussed concerns and issues with other co-workers at their cubicles. On July 27, 2011 at 10 a.m., Ms. Howard called plaintiff. Ms. Howard and Mr. Sahagun wanted to meet with plaintiff. In response, plaintiff sent an email to Ms. Howard and Mr. Sahagun at 10:28 a.m. Plaintiff wrote, "Please be advised that I have elevated my concerns regarding my duties and assignments in this section to Mr. Roberts and am awaiting a response from him." Later that day, Mr. Roberts directed Ms. Howard to go forward with the meeting to address plaintiff's concerns. Mr. Sahagun advised plaintiff she would be subject to discipline for refusing to attend the meeting. On July 28, 2011, Mr. Sahagun issued a warning letter to plaintiff for failure to follow instructions.

On August 1, 2011, Ms. Howard and Mr. Sahagun met with plaintiff. They met in plaintiff's cubicle. They instructed plaintiff to attend a meeting at Ms. Howard's office scheduled at 11:00 a.m. The meeting's purpose was to discuss plaintiff's concerns regarding her duties and assignments. Plaintiff did not attend the 11 a.m. meeting.

8

Instead, plaintiff sent Ms. Howard an e-mail at 11:34 a.m. stating that she needed a union representative to be present at the meeting. Ms. Howard replied that the 11 a.m. meeting involved work instructions and not discipline, thus a union representative's presence was not required. Ms. Howard stated plaintiff's failure to appear at the 11 a.m. meeting as instructed might subject her to further discipline. On August 4, 2011, Mr. Sahagun issued plaintiff a reprimand letter for failure to follow work instructions. In early August, plaintiff finally met with Ms. Howard and Mr. Sahagun. Plaintiff's union representative was present during the meeting.

Mr. Roberts, the department's acting deputy director, did not tell Ms. Howard or Mr. Sahagun about the settlement agreement. In his deposition, Mr. Roberts admitted he stopped reading plaintiff's e-mails at some point. But Mr. Roberts forwarded or copied plaintiff's e-mails to other employees so they would follow up on her concerns. Mr. Sahagun was unaware plaintiff had filed a previous complaint for harassment and discrimination. He was unaware plaintiff had any complaints based on discrimination, harassment or retaliation while working in the contracts and grants division. Mr. Sahagun also was unaware plaintiff had any medical condition or disability when she worked in his division.

On September 14, 2011, plaintiff received her reassignment termination letter. She was assigned back to the contract monitoring office on September 21, 2011. On January 3, 2012, the department rescinded plaintiff's reassignment to the contract monitoring office.

On September 15, 2011, plaintiff gave defendant two doctor's notes from August 2011. The August 7, 2011 note from the University of California at Los Angeles urgent care center states: "Please allow patient to be moved to new work environment. Stress apparent from individuals in current work environment. Please move to another bureau." The August 8, 2011 letter from Dr. Hawkin Woo at University of California at Los Angeles Healthcare states: "Please remove from current work environment in administrative service bureau . . . to another work environment where it can be ensured that she does not have any potential or direct contact or involvement with individuals

9

directly or indirectly involved with her formal complaints due to medical reasons.  Please accommodate earlier work schedule." Plaintiff presented the doctors' notes to Human Resources staff on the morning of September 15, 2011, who in turn provided her with workers' compensation paperwork.  Human Resources staff also advised her to go to urgent care based on her physical appearance.  Plaintiff went off work on September 15, 2011, and has not returned to active service.  Plaintiff testified her physician placed her on total temporary disability.

On July 13, 2012, plaintiff was issued an unsatisfactory job performance evaluation.  But on August 22, 2012, the evaluation was revised and plaintiff was given a competent evaluation.

### 3.  Disputed Facts

Plaintiff concedes the June 2011 settlement agreement did not discuss her work assignments and training in the contracts and grants division in detail.  But it was plaintiff's understanding that she would be trained upon transfer to the division.  The parties agree plaintiff interviewed with Ms. Howard and Mr. Sahagun in May 2011 before moving to the contracts and grants division.  Mr. Sahagun stated during the interview he notified plaintiff that her training would largely consist of shadowing an experienced employee for six months or more.  Plaintiff denied she was ever informed she would be shadowing employees for any length of time.  Mr. Sahagun stated he did not promise plaintiff any specific job assignments or work duties.  Plaintiff stated she was told she would be responsible for preparing for bidding conferences, writing board letters and memoranda and attending bidder conferences.

Mr. Sahagun stated a few weeks after plaintiff began working in the contracts and grants division, he was informed by staff she was not following proper work procedures. Plaintiff was e-mailing and saving her work in portable document format on her personal drive, instead of the shared "L" drive, which violated office practice.  Mr. Sahagun stated plaintiff was advised against this practice by himself, Ms. Howard, and Yvonne

Humphrey, a program analyst that plaintiff was assigned to shadow. Plaintiff admitted she saved documents in portable document format but stated she was not advised it was against office practice to do so. Mr. Sahagun stated he met with plaintiff on three occasions before July 25, 2011, to discuss saving her work in the L drive and her training concerns. Plaintiff denied these meetings were held to discuss saving her work in proper format. As for the scheduled July 27, 2011 meeting with Ms. Howard and Mr. Sahagun, plaintiff stated she never refused to meet with them. She requested the meeting be continued until she heard from Mr. Roberts. Likewise, plaintiff denied refusing to meet with Ms. Howards and Mr. Sahagun on August 1, 2011. She requested to continue the August 1, 2011 meeting so she could have a personal representative present. Plaintiff asked for a union representative to be present because she believed the meeting was not just about work assignments but also involved disciplinary action.

## C. Summary Judgment Ruling

On March 25, 2013, defendant's summary judgment motion was granted. The trial court ruled: plaintiff's sexual harassment claim was barred by the settlement agreement; defendant did not breach the settlement agreement based on an alleged failure to train and provide plaintiff with meaningful work assignments; the settlement agreement did not require defendant to assign plaintiff to the contracts and grants division for a reasonable period of time; plaintiff failed to establish a prima facie case of retaliation based on the disciplinary letters; plaintiff failed to establish the prima facie element of a causal link between the protected activity and the adverse actions; and Mr. Sahagun, who issued the disciplinary letters, did not know of plaintiff's prior complaints giving rise to the settlement agreement.

The trial court also ruled defendant did not fail to make reasonable job accommodations for plaintiff. The trial court ruled: plaintiff concealed her doctors' work restrictions for over a month before presenting them on September 15, 2011; once plaintiff presented her doctors' notes, she was provided with workers' compensation

11

paperwork and advised to go to urgent care; later that day, plaintiff was placed on temporary disabled status by her doctor; and defendant acted reasonably and in good faith upon presentation of plaintiff's doctors' notes.

On April 29, 2013, the trial court entered judgment in favor of defendant and against plaintiff. The judgment adds: "IT IS FURTHER ORDERED, ADJUDGED AND DECREED that plaintiff . . . take nothing from defendant. . . and that defendant is entitled to costs and disbursements from plaintiff in the amount of _____ pursuant to Code of Civil Procedure, §§ 1032, 1033 and 1033.5." Plaintiff filed her notice of appeal from the April 29, 2013 judgment on June 26, 2013.

## D. Defendant's Attorney's Fees Motion

On July 10, 2013, defendant moved for an award of $115,615.50 in attorney fees under Code of Civil Procedure, sections 1033.5, 1038, subdivision (a) and Government Code section 12965, subdivision (b). The attorney's fee motion was filed after the notice of appeal was filed. Plaintiff filed an opposition on July 29, 2010. Defendant filed a reply on August 2, 2013. On August 9, 2013, the trial court granted the motion, awarding defendant $40,000 in attorney fees. No separate notice of appeal was filed.

## III. DISCUSSION

### A. Summary Judgment Standards Of Review

In *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850-851 (*Aguilar*), our Supreme Court described a party's burdens on summary judgment motions as follows: "[F]rom commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. That is because of the general principle that a party who seeks a court's action in his favor bears the burden of persuasion thereon.

12

[Citation.] There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. . . . [¶] . . . [T]he party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact . . . . A prima facie showing is one that is sufficient to support the position of the party in question. [Citation.]" (Fns. omitted; see *Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878.)

This is an employment discrimination case. Thus, plaintiff's discrimination claim is subject to the burden shifting process established in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802-803 (*McDonnell Douglas*). (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 355-356 (*Guz*).) But, where the employer moves for summary judgment, the so-called *McDonnell Douglas* test is slightly modified: "A defendant employer's motion for summary judgment slightly modifies the order of [the *McDonnell Douglas*] showings. If, as here, the motion for summary judgment relies in whole or in part on a showing of nondiscriminatory reasons for the discharge, the employer satisfies its burden as moving party if it presents evidence of such nondiscriminatory reasons that would permit a trier of fact to find, more likely than not, that they were the basis for the termination. (See *Aguilar,* [*supra,*] 25 Cal.4th [at pp.] 850–851; cf. *Guz, supra,* 24 Cal.4th at p. 357.) To defeat the motion, the employee then must adduce or point to evidence raising a triable issue, that would permit a trier of fact to find by a preponderance that intentional discrimination occurred. (*Aguilar,* [*supra,* 25 Cal.4th] at pp. 850–851; *Guz,* [*supra,* 24 Cal.4th] at p. 357.) In determining whether these burdens were met, we must view the evidence in the light most favorable to plaintiff, as the nonmoving party, liberally construing her evidence while strictly scrutinizing defendant's. (*Aguilar,* [*supra,* 25 Cal.4th] at p. 856.)" (*Kelly v. Stamps.com*

*Inc.* (2005) 135 Cal.App.4th 1088, 1097-1098; see *Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1005.)

We review de novo the trial court's decision to grant the summary judgment motion. (*Coral Construction, Inc. v. City and County of San Francisco* (2010) 50 Cal.4th 315, 326; *Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 65, 67-68.) The trial court's stated reasons for granting summary judgment are not binding on us because we review its ruling not its rationale. (*Coral Construction, Inc. v. City and County of San Francisco, supra,* 50 Cal.4th at p. 336; *Continental Ins. Co. v. Columbus Line, Inc.* (2003) 107 Cal.App.4th 1190, 1196.) A summary judgment motion is directed to the issues framed by the pleadings. (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1250; *Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1252; *Goehring v. Chapman University* (2004) 121 Cal.App.4th 353, 364.) We construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in that party's favor. (*Conroy v. Regents of University of California, supra,* 45 Cal.4th at pp. 1249-1250; *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037 (*Yanowitz*).)

## B. Breach of Settlement Agreement Claim

To establish a contract breach claim, a plaintiff must show: the existence of a contract; performance or excuse for nonperformance; defendant's breach; and resulting damages. (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821; *Thrifty Payless, Inc. v. The Americana at Brand, LLC* (2013) 218 Cal.App.4th 1230, 1244.) Plaintiff argues the trial court erred in ruling there was no triable issue as to whether defendant breached the settlement agreement. Plaintiff contends defendant breached paragraph 4 of the settlement agreement. Paragraph 4 of the settlement agreement states: "[Defendant] agrees that there shall be no discrimination or retaliation of any kind against [plaintiff] as a result of filing this charge or against any person because of opposition to any practice deemed illegal under Title VII, EPA, ADEA, or ADA as a result of filing

14

this charge, or for giving testimony or assistance or for participating in any manner in an investigation, proceeding, or hearing under the aforementioned Acts." Plaintiff asserts defendant violated the settlement agreement by not giving her training and meaningful work assignments when she was reassigned to the contracts and grants division.

Plaintiff contends Mr. Roberts did everything he could to deny her any opportunity to achieve and gain promotion in the division. Mr. Roberts never told plaintiff's new supervisors, Ms. Howard and Mr. Sahagun, the terms of the settlement agreement. But the settlement agreement's express terms prohibited defendant and Mr. Roberts from disclosing plaintiff's prior discrimination complaint. Paragraph 7, subdivision (c) of the settlement agreement provides, "[Defendant] shall remove any references to the events giving rise to this discrimination charge from [plaintiff's] personnel file." Paragraph 7, subdivision (d) of the settlement agreement further states, "[Defendant] assures [plaintiff] that matters related to her complaint to the Office of Affirmative Action Compliance and her discrimination charge with EEOC shall be held in strictest confidence."

Plaintiff also argues Mr. Roberts ignored plaintiff's continuing requests for intervention in her new assignment in the contracts and grants division. In his deposition, Mr. Roberts admitted he stopped reading plaintiff's e-mails at some point. But Mr. Roberts forwarded or copied plaintiff's e-mails to other employees so they would follow up on plaintiff's concerns. Furthermore, Mr. Roberts's conduct is not a breach of paragraph 4 of the settlement agreement, which prohibits discrimination or retaliation against plaintiff. Neither paragraph 4 nor any other provision of the settlement agreement addresses plaintiff's training and work assignments upon transfer to the contracts and grants division.

Plaintiff also argues the trial court ignored defendant's written stand-alone policy which prohibits retaliation against employees. The policy states: "It is unlawful to retaliate against an individual for opposing employment practices that discriminate based on sex and all other bases enumerated under both State and Federal Laws, or for filing a discrimination charge, testifying, or participating in any way in an investigation,

15

proceeding, or litigation under FEHA or Title VII. [¶] . . . [¶] The theory of 'retaliation' is used when an employee asserts that he or she is experiencing reprisal for complaining about discrimination, for opposing practices prohibited by Title VII of the U.S. Civil Rights Act or the California Fair Employment and Housing Act or for participating in an EEOC or DFEH investigation. Retaliation complaints may also assert that an individual is being treated poorly for refusing unwanted sexual advances, or for refusing to participate in discriminatory conduct. Retaliation investigations compare how an individual was treated before and after he/she complained of discrimination or engaged in a 'protected activity.' The timing of the retaliatory act is a crucial piece of evidence. A 'causal connection' must be demonstrated between the 'act of harm' and the 'Charging Party's' earlier complaint of discrimination. Retaliation for reasons other than for filing or opposing practices prohibited by state or federal anti-discrimination statutes is not a 'protected activity.'" Plaintiff asserts defendant and Mr. Roberts had a mandatory obligation to enforce this policy irrespective of any provision in the settlement agreement. But defendant did not violate its policy against retaliation. As we discuss below, plaintiff fails to establish defendant retaliated against her.

## C.  Retaliation Claim

An employer may not "discharge, expel, or otherwise discriminate against any person" because the employee complains about actions made unlawful by the Fair Employment and Housing Act. (Gov. Code § 12940, subd. (h).) At a trial, "'a three-stage burden-shifting test'" is applied to retaliation claims. (*Batarse v. Service Employees Internat. Union, Local 1000* (2012) 209 Cal.App.4th 820, 831; *Yanowitz, supra,* 36 Cal.4th at p. 1042.) The plaintiff bears the initial burden of establishing a prima facie case of retaliation: "[I]n order to establish a prima facie case of retaliation under the [Fair Employment and Housing Act], a plaintiff must show (1) he or she engaged in a protected activity, (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the

16

employer's action." (*Yanowitz, supra,* 36 Cal.4th at p. 1042; *Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 472.) Further, an employer must act with a discriminatory or retaliatory motive or animus in order to be liable for unlawful retaliation. (*Joaquin v. City of Los Angeles* (2012) 202 Cal.App.4th 1207, 1226-1228; *Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 713, 715.) An employee may bring a retaliation claim for conduct he or she reasonably believes is subject to the Fair Employment and Housing Act protection. (*Yanowitz, supra,* 36 Cal.4th at p. 1043; *Miller v. Department of Corrections, supra,* 36 Cal.4th at p. 473.)

A presumption of retaliation arises if the plaintiff establishes a prima facie case. (*Yanowitz, supra,* 36 Cal.4th at p. 1042; *Batarse v. Service Employees Internat. Union, Local 1000, supra,* 209 Cal.App.4th at p. 831.) The burden then shifts to the employer to rebut the presumption by producing admissible evidence that its adverse employment action was taken for a legitimate, nonretaliatory reason. (*Yanowitz, supra,* 36 Cal.4th at p. 1042; *Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 989.) If the employer does so, the burden shifts back to the employee to prove intentional retaliation. (*Yanowitz, supra,* 36 Cal.4th at p. 1042; *Nadaf-Rahrov v. Neiman Marcus Group, Inc., supra,* 166 Cal.App.4th at p. 989.)

Plaintiff argues Mr. Roberts retaliated against her. Mr. Roberts signed the settlement agreement and was aware of its terms and conditions. Mr. Roberts also signed the September 14, 2011 reassignment termination letter, which transferred plaintiff back to the contract monitoring office. But the reassignment termination letter is not an adverse employment action because defendant later rescinded the letter on January 3, 2012. Moreover, plaintiff did not return to the contract monitoring office because she went on disability leave on September 15, 2011, the day after she received the reassignment termination letter. Plaintiff also asserts Mr. Roberts approved the July 10, 2012 unsatisfactory performance evaluation by Mr. Sahagun. But plaintiff admits the evaluation was timely challenged and modified to a competent evaluation on August 22, 2012. Plaintiff did not suffer an adverse employment action because her unsatisfactory performance evaluation was replaced and she was rated competent on the new evaluation.

17

(*Yanowitz, supra,* 36 Cal.4th at pp. 1052-1055; *Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 373.)

Plaintiff also contends Mr. Roberts retaliated against her through his approval of the letters of warning and reprimand issued by Mr. Sahagun. But Mr. Roberts is merely copied on the letters of warning and reprimand. There is no evidence Mr. Sahagun consulted and sought approval from Mr. Roberts before issuing the warning and reprimand letters. Also, it is undisputed Mr. Sahagun was unaware of plaintiff's prior complaint of sexual harassment and the settlement agreement. Plaintiff fails to establish a prima facie case of retaliation because there is no causal link between plaintiff's prior complaint and Mr. Sahagun's issuance of the two disciplinary letters.

D. Sexual Harassment Claim

It is an unlawful employment practice for an employer to harass an employee on the basis of sex under the Fair Employment and Housing Act. (Gov. Code § 12940, subd. (j) (1); *Miller v. Department of Corrections, supra,* 36 Cal.4th at pp. 460-461.) Government Code section 12940, subdivision (j)(4)(C) defines harassment because of sex as follows, "For purposes of this subdivision, 'harassment' because of sex includes sexual harassment, gender harassment, and harassment based on pregnancy, childbirth, or related medical conditions." (See *Lewis v. City of Benicia* (2014) 224 Cal.App.4th 1519, 1527, fn. 8.) In *Miller*, our Supreme Court stated: "[T]he prohibition against sexual harassment includes protection from a broad range of conduct, ranging from expressly or impliedly conditioning employment benefits on submission to or tolerance of unwelcome sexual advances, to the creation of a work environment that is hostile or abusive on the basis of sex. [Citations.] Such a hostile environment may be created even if the plaintiff never is subjected to sexual advances. [Citation.]" (*Miller v. Department of Corrections*, *supra*, 36 Cal.4th at pp. 461-462, fn. omitted; accord, *Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 277-278.) On another occasion, our Supreme Court explained, "[H]arassment focuses on situations in which the *social environment* of the

workplace becomes intolerable because the harassment (whether verbal, physical, or visual) communicates an offensive message to the harassed employee." (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 706; see *Rehmani v. Superior Court* (2012) 204 Cal.App.4th 945, 951.) When the harasser is a nonsupervisory employee, an employer is liable if the employer knew or should have known of the harassment and failed to take appropriate corrective action. (Gov. Code § 12940, subd. (j)(1); *Roby v. McKesson Corp., supra,* 47 Cal.4th at p. 707; *Rehmani v. Superior Court, supra,* 204 Cal.App.4th at p. 952.)

To establish a sexual harassment cause of action, plaintiff must show: she belongs to a protected group; she was subject to unwelcome sexual harassment; the harassment complained of was based on sex; the harassment complained of was sufficiently pervasive as to alter the conditions of employment and create an abusive working environment; and respondeat superior. (*Jones v. Department of Corrections & Rehabilitation* (2007) 152 Cal.App.4th 1367, 1377; *Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 608.) Whether the work environment is hostile or abusive is determined in light of the totality of circumstances. (*Miller v. Department of Corrections*, *supra*, 36 Cal.4th at p. 462 citing *Harris v. Forklift Systems, Inc.* (1993) 510 U.S. 17, 23; *Fuentes v. AutoZone, Inc.* (2011) 200 Cal.App.4th 1221, 1227.) These circumstances may include: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. (*Miller v. Department of Corrections*, *supra*, 36 Cal.4th at p. 462 citing *Harris v. Forklift Systems, Inc., supra,* 510 U.S. at p. 23; *Fuentes v. AutoZone, Inc., supra,* 200 Cal.App.4th at p. 1227.) An employee cannot recover for harassment that is occasional, isolated, sporadic or trivial. (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1043; *Lyle v. Warner Brothers Television Productions, supra,* 38 Cal.4th at p. 283; *Fuentes v. AutoZone, Inc., supra,* 200 Cal.App.4th at p. 1226.)

Plaintiff argues she has established one or more triable issues of material fact as to her claim of oral sexual harassment. It is undisputed her sexual harassment cause of

action arises from incidents that predate the settlement agreement. Plaintiff concedes she is barred by the settlement agreement and supplemental release from bringing her sexual harassment claim. Paragraph 2 of the supplemental release states, "In exchange for the promises made by [defendant] contained in the EEOC Settlement Agreement, [plaintiff] agrees to withdraw from consideration by any state or federal agency or court of law or other government entity, including, but not limited to, the EEOC, the Department of Fair Employment and Housing (DFEH), or the Los Angeles County Office of Affirmative Action Compliance (OAAC), any charge or complaint of discrimination or other claims relating to illegal discrimination, which are now pending on [plaintiff's] behalf against [defendant], its officers, agents or employees." Paragraph 3 of the supplemental release adds, "[Plaintiff] will not institute or cause to be instituted any action in state or federal court, or before any state, local or federal government entity arising from or attributable to any alleged unlawful practice of the [defendant], its officers, agents or employees arising from or attributable to the above-referenced EEOC Charge, or OAAC Complaint."

Notwithstanding these provisions, plaintiff contends she can sue for sexual harassment because they conflict with paragraphs 4 and 6 of the settlement agreement. Paragraph 4 of the settlement agreement states, "[Defendant] agrees that there shall be no discrimination or retaliation of any kind against [plaintiff] as a result of filing this charge or against any person because of opposition to any practice deemed illegal under Title VII, EPA, ADEA, or ADA as a result of filing this charge, or for giving testimony or assistance or for participating in any manner in an investigation, proceeding, or hearing under the aforementioned Acts." Paragraph 6 of the settlement agreement provides: "The parties agree that the government is authorized to investigate compliance with this agreement. This agreement may be specifically enforced in court by the government or the parties, and may be used as evidence in a subsequent proceeding in which any of the parties allege a breach of this agreement." As a matter of law, paragraphs 4 and 6 of the settlement agreement do not conflict with paragraphs 2 and 3 of the supplemental release. Because plaintiff's sexual harassment claim is based on conduct that predates the

20

settlement agreement, she is barred from bringing the claim under the settlement agreement and supplemental release.

E.  Failure to Accommodate Claim

An employer must make reasonable accommodation for the known physical or mental disability of an employee under the Fair Employment and Housing Act.  (Gov. Code § 12940, subd. (m); *A.M. v. Albertsons, LLC* (2009) 178 Cal.App.455, 463.)  To establish a failure to accommodate claim, plaintiff must show:  she has a disability under the Fair Employment and Housing Act; she is qualified to perform the essential functions of the position; and the department failed to reasonably accommodate her disability. (*Scotch v. Art Institute of California, supra,* 173 Cal.App.4th at pp. 1009-1010; *Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1192.)  An employer is not required to choose the best or specific accommodation sought by the employee.  (*Wilson v. County of Orange, supra,* 169 Cal.App.4th at p. 1194; *Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 228.)  A reasonable accommodation includes giving the employee accrued paid leave or additional unpaid leave for treatment.  However, the employee must prove he or she likely can perform her employment duties at the end of such leave. (*Wilson v. County of Orange, supra,* 169 Cal.App.4th at pp. 1193-1194; *Hanson v. Lucky Stores, Inc., supra,* 74 Cal.App.4th at p. 226.)

Plaintiff does not challenge the trial court's ruling that defendant acted reasonably and in good faith when she presented her doctors' notes on September 15, 2011. Defendant provided plaintiff with workers' compensation paperwork and advised her to go to urgent care based on her physical appearance when it received the August 2011 doctors' notes.

On appeal, plaintiff challenges the trial court's ruling she concealed her physicians' work restrictions for over a month before presenting the doctors' notes. Plaintiff argues her one month delay in presenting her doctors' notes was justified and excused because of Mr. Roberts's retaliatory conduct.  But even if we assume plaintiff's

21

one month delay was justified, she presented no evidence defendant failed to reasonably accommodate her disability. On September 15, 2011, defendant provided plaintiff with workers' compensation paperwork and advised her to go to urgent care. Later that day, plaintiff was placed on temporary disabled status by her doctor. Plaintiff has not returned to active service since September 15, 2011. Here, defendant reasonably accommodate plaintiff by giving her leave to obtain treatment for her disability.

## F. Attorney's Fee Award

Defendant moved for attorney's fees under Code of Civil Procedure section 1038, subdivision (a) and Government Code section 12965, subdivision (b). The trial court granted the motion and awarded defendant $40,000 in attorney fees. We review the trial court's ruling for an abuse of discretion. (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1275-1276; *Jersey v. John Muir Medical Center* (2002) 97 Cal.App.4th 814, 832.)

Under Code of Civil Procedure section 1038, subdivision (a), the trial court may award defense costs, including reasonable attorney's fees, if the action was brought without either good faith or reasonable cause. (*Kobzoff v. Los Angeles County Harbor/UCLA Medical Center* (1998) 19 Cal.4th 851, 863-864; *Clark v. Optical Coating Laboratory, Inc.* (2008) 165 Cal.App.4th 150, 183.) The defendant may recover reasonable costs after prevailing on a dispositive motion including summary judgment. (Code Civ. Proc., § 1038, subd. (a); *Kobzoff v. Los Angeles County Harbor/UCLA Medical Center, supra,* 19 Cal.4th at p. 856.) An award of defense costs may be made only on notice and an opportunity to be heard. (Code Civ. Proc., § 1038, subd. (a); *Kobzoff v. Los Angeles County Harbor/UCLA Medical Center, supra,* 19 Cal.4th at p. 857.)

Under Government Code section 12965, subdivision (b), the trial court may award reasonable attorney's fees and costs to the prevailing party under the Fair Employment and Housing Act. Attorney fees may be awarded to a prevailing defendant if the action

22

brought is unreasonable, frivolous, meritless or groundless. (*Robert v. Stanford University* (2014) 224 Cal.App.4th 67, 70; *Cummings v. Benco Building Services* (1992) 11 Cal.App.4th 1383, 1387, citing *Christianburg Garment Co. v. EEOC* (1978) 434 U.S. 412, 421.) Meritless means groundless or without foundation, rather than simply that plaintiff ultimately lost her case. (*Robert v. Stanford University, supra,* 224 Cal.App.4th at p. 70; *Manganov. Verity, Inc.* (2008) 167 Cal.App.4th 944, 949.) Plaintiff argues the trial court abused its discretion in granting attorney's fees to defendant.

But we do not have jurisdiction to review the attorney fee order. This is because plaintiff did not file a separate notice of appeal from the attorney fee award. If an order awarding attorney fees is made after judgment, it is separately appealable and requires a separate timely notice of appeal. (*Silver v. Pacific American Fish Co., Inc.* (2010) 190 Cal.App.4th 688, 694 (*Silver*); *DeZerega v. Meggs* (2000) 83 Cal.App.4th 28, 43; *Fish v. Guevara* (1993) 12 Cal.App.4th 142, 147-148; *Norman I. Krug Real Estate Investments, Inc. v. Praszker* (1990) 220 Cal.App.3d 35, 45-46.) Here, the trial court awarded attorney fees under Code of Civil Procedure section 1038, subdivision (a) and Government Code section 12965, subdivision (b). The attorney fees award to defendant under these statutes was not a matter of right because the trial court was required to make findings before granting such fees. (Cf. *Grant v. List & Lathrop* (1992) 2 Cal.App.4th 993, 997-998 [notice of appeal from judgment subsumed later order setting award amounts where judgment expressly provided for an award of fees and costs].)

This case is factually similar to *Silver*, *supra,* 190 Cal.App.4th at pages 692 through 694. In *Silver*, we rejected a cross-complainant's argument that he did not have to file a separate appeal notice because the judgment provided attorney's fees to the cross-defendant. (*Id*. at pp. 692-693.) In *Silver,* the judgment provided the cross-defendant, "'shall recover . . . attorney fees and costs of suit,'" but left a blank space for the amount. (*Silver, supra,* 190 Cal.App.4th at p. 692.) We explained: "Notwithstanding the language in the judgment, it is clear that the parties subsequently litigated in a separate postjudgment proceeding not only the reasonableness of the amount of the attorney fees [the cross-defendant] was claiming, but also the threshold issue of

23

[the cross-defendant's] *entitlement* to such fees." (*Silver, supra,* 190 Cal.App.4th at p. 692.) Similar to *Silver,* the April 29, 2013 judgment states "[D]efendant is entitled to costs and disbursements from plaintiff" but left a blank space for the amount. The summary judgment papers and ruling did not discuss the attorney fee issue. Like *Silver*, the parties litigated defendant's entitlement to attorney fees and the amount of such fees in a separate postjudgment proceeding. Plaintiff's appeal of the attorney's fee order is dismissed because we do not have jurisdiction to consider the matter.

## IV. DISPOSITION

The April 29, 2013 judgment is affirmed and plaintiff's appeal from the order awarding attorney fees to defendant is dismissed. Defendant, County of Los Angeles, shall recover its appeal costs from plaintiff, Raquel Montejano. Any issue concerning attorney's fees on appeal may be pursued pursuant to California Rules of Court rules 3.1702(c)(1) and 8.278(c)(1).

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

TURNER, P. J.

We concur:

MOSK, J.                                    MINK, J.[*]

---

[*]    Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

24