Filed 5/17/24  Irvine Presbyterian Church v. Milner CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| IRVINE PRESBYTERIAN CHURCH et al., <br><br>    Plaintiffs, Cross-defendants and Appellants, <br><br>        v. <br><br> CAROL SCHULLER MILNER, <br><br>    Defendant, Cross-complainant and Appellant. | G061041, G061434 <br><br> (Super. Ct. No. 30-2017-00954144) <br><br> O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Deborah C. Servino, Judge.  Affirmed in part, reversed in part, and remanded with directions.

The Law Office of Evan D. Williams and Evan D. Williams for Defendant, Cross-complainant, and Appellant.

Fozi Dwork & Modaferri, Golnar J. Fozi, and Daniel S. Modaferri for Plaintiffs, Cross-defendants, and Appellants.

\*          \*          \*

The underlying action arose from a dispute concerning a play called "Glory of Creation" that defendant Carol Schuller Milner wrote, produced, and directed. Plaintiff Crystal Cathedral Ministries staged the play on the campus of plaintiff Crystal Cathedral (which was later merged into plaintiff Irvine Presbyterian Church). We collectively refer to the plaintiffs as CCM.

CCM cancelled the play after one season in 2005. Milner and CCM subsequently entered into a settlement agreement detailing how they would dispose of physical property created for the play. Some of the property was allocated to Milner, and some was allocated to CCM. The agreement also included language stating CCM would keep "all goods" in the same condition they were in at the end of the 2005 season. The parties later disagreed about CCM's obligation to continue storing Milner's property and its handling of the property. CCM is continuing to store Milner's property to this day.

In 2017, CCM initiated the underlying action seeking, among other things, declaratory relief that it had no continuing obligation to store Milner's property and could dispose of the items. Milner filed a cross-complaint alleging CCM was required to store her property, breached the settlement agreement, tortiously converted her property, and was negligent by allowing her property to be damaged or removed.

The trial court ultimately granted summary judgment on CCM's complaint in Milner's favor and found the claims were barred by the applicable statute of limitations. The court also granted summary adjudication on Milner's negligence claim in CCM's favor and found it was barred by the statute of limitations. Milner's breach of contract and conversion claims proceeded to a trial, and the jury found in favor of CCM.

Milner raises three arguments on appeal. First, she contends the court erred by granting summary adjudication on her negligence claim because it was not barred by the statute of limitations. Second, she argues the court erred by excluding certain evidence at trial. Third, she claims the court improperly admitted expert testimony that was outside the scope of the expert's deposition. We disagree with Milner's contentions.

2

Her negligence claim was barred by the statute of limitations, and the court did not abuse its discretion with respect to any evidentiary issues.

CCM cross-appeals and argues the court erred by granting summary judgment on its declaratory relief cause of action because the claim is not time-barred. We agree and reverse the judgment in part. On remand, the trial court is directed to enter an order denying Milner's motion for summary judgment on CCM's declaratory relief cause of action. In all other respects, the judgment is affirmed.

# FACTS[1]

*Milner's Play*

Milner, the daughter of CCM's founders, wrote a play called the "Glory of Creation" (the Play). She registered the copyright for the Play and directed pre-production, including costume and scene design, storyboards, and key art.

CCM decided to stage the Play in 2005, and the executive committee of CCM's board of directors (the Executive Committee) authorized a $15 million budget for the Play. The Play premiered in 2005, but CCM cancelled the Play after one season and disputes arose between the parties regarding the future of the Play.

*The Parties' Settlement Agreement*

In July 2006, Milner and CCM signed an agreement settling their dispute over the cancellation of the Play (the Settlement Agreement). Among other things, the parties agreed all rights to the Play reverted back to Milner, and CCM would need Milner's written consent if it wanted to produce the Play or present its creative elements

---

[1] On our own motion, we augment the record to include: (1) CCM's responsive separate statement of undisputed facts regarding Milner's summary judgment motion; (2) Milner's responsive separate statement of undisputed facts regarding CCM's summary judgment motion; and (3) the trial court's October 4, 2021 minute order. (Cal. Rules of Court, rule 8.155(a)(1)(A).)

in the future. The parties also reached an agreement on how they would dispose of physical property commissioned and created for the Play. The latter was reflected in a "Schedule 1" attached to the Settlement Agreement.

The parties later agreed to a trust agreement and revised Schedule 1. The revised Schedule 1 identified "show specific" property to be distributed to Milner (*e.g.*, effects equipment, drawings, artwork, puppets, etc.) and "non-show specific" property to be distributed to CCM (*e.g.*, projectors, lighting, audio delivery system, etc.). The document further included the following language, which is central to part of this appeal: CCM would "keep all goods in same condition as they were in at the end of the '05 season."

For several years after the 2006 Settlement Agreement, some of the property allocated to Milner under the agreement was stored in CCM's warehouse and trailers.

*CCM's Bankruptcy and Post-Settlement Communications*

In 2010, CCM filed a Chapter 11 bankruptcy petition. In October 2010, Milner sent an e-mail to CCM's bankruptcy counsel and two members of CCM's board of directors (the Board) noting she owned certain property pursuant to the Settlement Agreement. She indicated she had attached relevant documentation if it was necessary for CCM to document assets in the bankruptcy proceeding. In response, a Board member confirmed Milner owned her property that was kept at CCM. But he stated he did not know what warehouse or trailers CCM would lose given the bankruptcy and suggested Milner "think about getting them into [her] hands and [her] own storage facility sooner rather than later." Among other things, Milner responded the Settlement Agreement required CCM to keep the property in the same condition as when the Play ended, but she understood "practically speaking, that may not work."

4

In a November 2010 e-mail exchange, a CCM Board member again reassured Milner that she owned her property in CCM's possession. In December 2011 and January 2012 e-mails, a Board member also confirmed Milner's ownership of certain items hanging in the cathedral.

In May 2012, CCM's president and chief executive officer sent a letter to Milner informing her she needed to remove her property from CCM's warehouse and trailers by specific dates in May and June 2012. If she did not take her items, CCM would consider the items abandoned and would dispose of them. A few weeks later, Milner's attorney responded that Milner had inspected some of her property at CCM's warehouse and discovered some of the property was missing or inaccessible for inspection.

On June 25, 2012, CCM's attorney wrote a follow-up letter to Milner's attorney and indicated CCM was "storing certain items related to the [Play] that [Milner] allegedly owns" at CCM's warehouse and trailers. He requested Milner take possession of the property by the end of June 2012. He also responded to Milner's contentions that CCM had failed to provide an inventory of property in its custody and that some of the property was missing or damaged. According to CCM's attorney, Milner's alleged ownership interest stemmed from the Settlement Agreement, which CCM did not believe was a valid agreement because it was a "'self-dealing transaction'" that was not ratified by the Board. A few days later, Milner's attorney wrote a letter to CCM's attorney stating Milner could not remove her property until she knew where all of it was and had physical access to all the property.

Around October 15, 2012, Milner retrieved some of her property from CCM's warehouse and took handwritten notes indicating some of the property was damaged.

5

In February 2013, CCM's attorney sent an e-mail to Milner's attorney stating it was unclear if Milner wanted to take her remaining items in CCM's possession. CCM's attorney emphasized it had given Milner several opportunities to take the items and provided her with one last "warning" to do so. CCM and Milner subsequently communicated about her retrieving her property from the trailers in Riverside, California. Milner emphasized she had to inspect and document the items and ultimately insisted CCM bring the trailers to Orange County. CCM declined the latter request. In March 2013, CCM's attorney sent a follow-up e-mail to Milner's attorney demanding she retrieve her property. He stated CCM would abandon the items because it could not "front the cost of storing [her] items and with the pending move [the] matter [had to] be resolved." In April 2013, the parties had further communications about Milner's property in CCM's trailers. In April and May 2017, CCM's attorney sent additional letters to Milner requesting she retrieve her property from CCM's trailers.

*CCM's Complaint and Milner's Cross-Complaint*

CCM commenced the instant action on November 7, 2017. In 2019, CCM filed the operative first amended complaint against Milner alleging causes of action for: (1) cancellation or reformation of written instruments; (2) declaratory relief; and (3) injunctive relief.

According to the complaint, the Settlement Agreement and Schedule 1 were subject to cancellation or reformation and were void or voidable because the documents had been approved by the Board's Executive Committee, which at the time was controlled by Milner's parents. Among other things, the complaint also alleged the documents were subject to cancellation or reformation because CCM had to indefinitely store a large amount of Milner's property for no consideration and was mistaken or defrauded by her drafting of an unconscionable term.

Alternatively, assuming the Settlement Agreement and Schedule 1 were enforceable, the complaint sought declaratory relief. The complaint alleged there was an actual controversy regarding the parties' rights and duties to store the Play items. If a relationship was formed between the parties, the relationship was an involuntary deposit, a storage agreement, or a gratuitous bailment. The complaint alleged the relationship terminated after CCM gave notice to Milner and told her to remove the stored items in 2012. CCM accordingly sought a judicial determination that it had no continuing obligation to store and maintain the stored Play items and could dispose of them. CCM also sought a mandatory injunction compelling Milner to remove the items from CCM's premises.

In response, Milner filed a cross-complaint in 2019 and the operative second amended cross-complaint in 2020. The cross-complaint alleged CCM was required to store Milner's property under the Settlement Agreement given language in Schedule 1 indicating CCM would keep the goods "'in same condition as they were in at the end of the '05 season.'" CCM allegedly breached the Settlement Agreement by stating it would no longer store the items in April 2017 and by refusing to grant Milner access to the trailers in February 2018 unless she released all claims against CCM. According to the cross-complaint, CCM did not allow Milner to access her property in the trailers until January 2019, and she eventually discovered some of the property was missing or damaged. The complaint accordingly alleged causes of action for: (1) breach of contract; (2) conversion; and (3) negligence.

*Milner's Motion for Summary Judgment*

In October 2019, Milner moved for summary judgment, or in the alternative summary adjudication, seeking judgment in her favor on CCM's complaint. Among other things, Milner argued CCM's first cause of action (cancellation or reformation of written instruments) and second cause of action (declaratory relief) were

7

barred by the applicable statutes of limitation. She also argued the third cause of action for injunctive relief was a remedy and not a proper cause of action.

In its opposition, CCM argued, inter alia, there was a factual dispute as to whether it was aware of any fraud or mistake regarding the Settlement Agreement's terms before filing its complaint in 2017. CCM similarly argued it was disputed whether the Board knew the Settlement Agreement was void or voidable after the bankruptcy action.

*The Court's Order Granting Milner's Motion for Summary Judgment*

In January 2020, the court granted summary judgment in Milner's favor on CCM's complaint. The court held CCM's first and second causes of action were barred by the applicable statutes of limitation. Regarding the first cause of action (cancellation or reformation of written instruments), the court noted several possible statutes of limitation — four years for cancellation of written instruments (Code Civ. Proc., § 343); three years for a claim to set aside or cancel a void instrument when fraud or mistake is involved (Code Civ. Proc., § 338); three years to commence an action for relief on the ground of fraud or mistake (*id*., subd. (d)); and five years under Corporations Code section 9243, subdivision (e). Regarding the second cause of action (declaratory relief), the court noted the statute of limitations was four years if the claim was based on CCM's "obligations founded upon" the Settlement Agreement and Schedule 1. To the extent the declaratory relief claim was based on a gratuitous bailment, the court held the statute of limitations was three years. (Code Civ. Proc., § 338, subd. (a).)

According to the court, the causes of action were time-barred under all the above statutes. The court held CCM was "aware of the facts that started the statute of limitations as early as 2006, and no later than June 25, 2012." The court relied on CCM's June 25, 2012 letter to Milner's attorney demanding Milner remove her items from CCM's warehouse and trailers by June 30, 2012. While CCM argued its Board did not

8

know the Settlement Agreement and Schedule 1 were void or voidable until sometime after the bankruptcy action, the court was not persuaded by this argument. The court indicated "'it is the discovery of facts, not their legal significance, that starts the statute.'" Finally, the court held the third cause of action for injunctive relief failed as a matter of law because the underlying first and second causes of action could not be established.

*CCM's Motion for Summary Judgment*

In June 2020, CCM moved for summary judgment, or in the alternative summary adjudication, seeking judgment in its favor on Milner's cross-complaint. Among other things, CCM argued Milner knew in 2012 that some of her property at CCM's warehouse had been damaged. CCM accordingly argued Milner's cross-complaint was filed in 2019 after the statute of limitations had expired on each of her claims.

Milner filed an opposition and argued, inter alia, that CCM did not meet its burden of production on the statute of limitations issue. While CCM produced evidence Milner knew her property in CCM's warehouse was damaged in 2012, she argued CCM did not produce any evidence about when she knew the property in CCM's trailers was damaged.

*The Court's Order Granting Summary Adjudication on Milner's Negligence Claim*

In September 2020, the court denied summary judgment on Milner's cross-complaint but granted summary adjudication on her negligence claim. Among other things, the court noted the cross-complaint alleged CCM was negligent by failing to properly handle Milner's property and by allowing the property to be damaged, taken, or lost. The court then held it was undisputed Milner realized some of her property was damaged on October 15, 2012, when she went to retrieve her property from CCM's warehouse. Given the three-year statute of limitations for negligence claims, the court

9

concluded the statute of limitations expired in October 2015 before Milner filed her cross-complaint in 2019.

*Jury Verdict and Judgment*

In October 2021, Milner's claims against CCM for breach of contract and conversion proceeded to a jury trial. The jury returned a special verdict finding CCM had not breached any contract and did not "substantially interfere with [Milner's] property by knowingly or intentionally preventing [her] from having access to, destroying, and/or refusing to return [her] property after [she] demanded its return."

In November 2021, the court entered judgment that CCM "take nothing by [its] First Amended Complaint" and Milner "takes nothing by her Second Amended Cross-Complaint." The parties timely appealed.

DISCUSSION

Milner contends the court erred by granting summary adjudication on her negligence claim because it was not barred by the statute of limitations. She next argues the court erred by excluding relevant evidence at trial. Finally, she claims the court erred by admitting certain expert testimony. For the reasons below, we disagree with Milner's contentions. CCM cross-appeals and argues the court erred by granting summary judgment on its declaratory relief claim. According to CCM, the claim is not time-barred. We agree and reverse the judgment.

*The Court Properly Granted Summary Adjudication on Milner's Negligence Claim*

　　　A. Standard of Review

"'A defendant making the motion for summary adjudication has the initial burden of showing that the cause of action lacks merit because one or more elements of the cause of action cannot be established or there is a complete defense to that cause of

10

action. [Citations.] If the defendant fails to make this initial showing, it is unnecessary to examine the plaintiff's opposing evidence and the motion must be denied. However, if the moving papers establish a prima facie showing that justifies a judgment in the defendant's favor, the burden then shifts to the plaintiff to make a prima facie showing of the existence of a triable material factual issue.'" (*Rehmani v. Superior Court* (2012) 204 Cal.App.4th 945, 950.)

"In reviewing an order granting summary adjudication, 'we apply the same standard of review applicable on appeal from a grant of summary judgment. [Citation.] Accordingly, "'. . . we take the facts from the record that was before the trial court when it ruled on that motion. [Citation.] "'We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.'" [Citation.] We liberally construe the evidence in support of the party opposing summary [adjudication] and resolve doubts concerning the evidence in favor of that party.'"'" (*Rehmani v. Superior Court, supra*, 204 Cal.App.4th at pp. 950-951.)

"While resolution of the statute of limitations issue is normally a question of fact, where the uncontradicted facts established through discovery are susceptible of only one legitimate inference, summary judgment is proper." (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1112 (*Jolly*).)

B. Statute of Limitations

The statute of limitations for negligent injury to property is three years. (Code Civ. Proc., § 338, subd. (c)(1).) The statute of limitations begins to run when the cause of action accrues. (*Id.*, § 312; *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397 (*Norgart*).) A cause of action generally accrues when it "is complete with all of its elements." (*Norgart*, at p. 397.) An exception to this rule is the discovery rule. (*Ibid.*

11

The discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." (*Norgart*, *supra*, 21 Cal.4th at p. 397.) "[T]he plaintiff discovers the cause of action when he at least suspects a factual basis, as opposed to a legal theory, for its elements, even if he lacks knowledge thereof — when, simply put, he at least 'suspects . . . that someone has done something wrong' to him [citation], 'wrong' being used, not in any technical sense, but rather in accordance with its 'lay understanding.'" (*Id.* at pp. 397-398, quoting *Jolly*, *supra*, 44 Cal.3d 1103.) "He has reason to suspect when he has ""'"notice or information of circumstances to put a reasonable person *on inquiry*"'"" [citation]; he need not know the 'specific "facts" necessary to establish' the cause of action; rather, he may seek to learn such facts through the 'process contemplated by pretrial discovery'; but, within the applicable limitations period, he must indeed seek to learn the facts necessary to bring the cause of action in the first place . . . ." (*Norgart*, at p. 398.)

Here, Milner was on inquiry notice in 2012 that CCM had not cared for her property as she believed CCM was obligated to do. In May and June 2012, CCM demanded Milner take possession of all her property stored by CCM. In May 2012, Milner's attorney sent an e-mail to CCM's attorney indicating Milner had inspected her property at CCM's warehouse and discovered some of the property was missing or inaccessible for inspection. In June 2012, Milner's attorney sent another letter to CCM's attorney stating Milner could not remove her property until she knew where all of it was and had physical access to it. On October 15, 2012, Milner retrieved some of her property from CCM's warehouse and observed some items were damaged. Given these facts, it is undisputed Milner had notice CCM was not taking reasonable care of her property as of October 2012. Milner's negligence cause of action therefore accrued in October 2012, and the statute of limitations expired in October 2015.

Milner concedes she discovered some of her property was damaged in October 2012. She also agrees "[a]ny cause of action for the negligent storage of items in the warehouse undoubtedly accrued in 2012." But she contends her retrieval of damaged property from the *warehouse* did not cause her negligence claim to accrue because "there is no basis for which [she] would be expected to inspect [her property in the] *trailers* based on the shoddy condition of . . . *warehouses*." (Italics added.) She notes her cross-complaint sought relief for damage to property stored in the trailers and not to property in the warehouse. As the trial court held, this is a distinction without a difference. Milner was on inquiry notice, having been notified that some property was damaged and that the entity storing the remainder claimed it had no responsibility to even store the property. Once Milner had suspicion of wrongdoing — *i.e.*, damage to her property — "and therefore an incentive to sue, she [had to] decide whether to file suit or sit on her rights." (*Jolly*, *supra*, 44 Cal.3d at p. 1111.) "So long as a suspicion exist[ed, Milner had to] go find the facts [and could not] wait for the facts to find her." (*Ibid.*)

Milner also argues "[t]he evidence . . . does not indicate that the trailers were opened between 2005 and 2017." She concludes: "If [a] jury believes . . . the damage occurred when Mr. Dawson opened and inspected . . . Milner's property [in 2017], then the cause of action would not have accrued until 2017 and this action would be timely." Regardless of when the trailers were opened, Milner had suspicion of wrongdoing in 2012 when she learned some of her property was damaged. CCM also repeatedly informed her it did not have any storage obligations and would dispose of the property in both the warehouse and trailers in 2012.

For the foregoing reasons, the trial court correctly held Milner's negligence claim was time-barred because she did not assert the claim until 2019 — after the statute of limitations expired in 2015.

13

*The Court Did Not Abuse Its Discretion by Excluding Certain Evidence*

Milner next claims the court erred by excluding evidence relevant to her conversion claim. The court did not abuse its discretion. (*Litinsky v. Kaplan* (2019) 40 Cal.App.5th 970, 988 ["We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard"].)

A. Evidence Regarding CCM's Bankruptcy Court Proceedings

1. Relevant Background

In 2018, CCM's attorney filed a motion in the bankruptcy court for an order to show cause why Milner and her counsel should not be held in contempt for violating the bankruptcy court's discharge injunction. CCM argued Milner violated the bankruptcy court's discharge injunction by asserting affirmative defenses in this action arising out of the allegedly rejected Settlement Agreement. The bankruptcy court denied the contempt motion, finding the Settlement Agreement was not discharged in the bankruptcy proceedings because it was not an executory contract. The bankruptcy court also sanctioned CCM's attorney for filing a frivolous contempt motion intended to pressure Milner to release her claims. The Bankruptcy Appellate Panel of the Ninth Circuit (BAP) affirmed the sanctions award against CCM's counsel. In 2019, CCM filed an amended complaint omitting allegations regarding discharge of the Settlement Agreement in bankruptcy.

Before trial on Milner's breach of contract and conversion claims, Milner filed a motion in limine seeking to preclude CCM from arguing the Settlement Agreement was unenforceable or Milner had not fulfilled her obligations under it. In support of the motion, she requested the court take judicial notice of CCM's contempt motion in the bankruptcy court, the bankruptcy court's order denying the contempt motion, and the BAP's decision. The court denied Milner's motion.

14

At trial, Milner sought to elicit witness testimony about the bankruptcy proceedings. It appears the trial court generally sustained CCM's objections on the grounds of relevance and Evidence Code 352.[2] In a sidebar, Milner's counsel insisted the jury should hear testimony about CCM's contempt motion in the bankruptcy court. He explained CCM had claimed the Settlement Agreement was rejected and Milner therefore did not own the property in the trailers. He added: "If . . . Milner had not defended that case, the property would have been gone, she would not have it . . . . Therefore it was her actions — taking actions basically to get back her property which had been converted."

### 2. Analysis

Milner contends the trial court improperly excluded the documents concerning CCM's contempt motion in the bankruptcy proceedings. She argues the documents were relevant to prove her conversion claim because they show she owned the property stored in CCM's trailers and CCM interfered with her access to it and further refused to return the property. She emphasizes the BAP's findings that CCM's counsel tried to pressure her into releasing her claims is probative as to whether CCM denied her access to her property when she asked for it.

Despite Milner's assertions, she does not cite to any portion of the record where her counsel attempted to present the bankruptcy documents to the jury as evidence. Instead, she cites to her motion in limine and various portions of the record where her counsel made offers of proof as to why it would be appropriate to elicit witness testimony about the bankruptcy proceedings. As noted *ante*, it appears the trial court generally sustained objections to this line of questioning on relevancy and section 352 grounds.

---

[2] All further statutory references are to the Evidence Code unless otherwise stated.

15

The court did not abuse its discretion.  "No evidence is admissible except relevant evidence."  (§ 350.)  "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (§ 210.)  Trial courts have broad discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (§ 352.)  Here, the proffered testimony about the bankruptcy proceedings was not relevant to the action.  Indeed, CCM's amended complaint omitted all allegations regarding discharge of the Settlement Agreement in bankruptcy.  And the bankruptcy court had no jurisdiction to consider whether CCM converted Milner's property.  Even assuming, arguendo, the bankruptcy proceedings were relevant, the evidence created a substantial danger of confusing the issues for the jury.  A jury unfamiliar with bankruptcy law might have believed the bankruptcy court found CCM was liable for converting Milner's property or violating her rights, which it did not do.  We cannot say the court's ruling was "'arbitrary, capricious, or patently absurd.'"  (*San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1419.)

We also note Milner cites to a portion of the reporter's transcript where her attorney questioned a witness about CCM's contract with Milner's father regarding his retirement and involvement with church matters.  Her attorney tried to elicit testimony about CCM's rejection of the latter contract in the bankruptcy proceedings.  The court sustained CCM's objections to this line of questioning based on relevance and section 352.  In a side bar, Milner's attorney insisted the jury should be informed about Milner's negotiations with CCM and her attempts to avoid having her father's contract rejected in

16

the bankruptcy proceedings. For the same reasons discussed above, this evidence has no probative value with respect to Milner's conversion claim.

In short, the court did not abuse its discretion by excluding testimony about the bankruptcy proceedings.

### B. Evidence of the Parties' April 2013 Communications

#### 1. Relevant Background

In April 2013, CCM offered to transfer title to the trailers containing Milner's property to Milner if she could get them "roadworthy." But on April 25, 2013, CCM's attorney sent an e-mail to Milner's attorney indicating he had to "revise the comments regarding . . . title to the trailers." He explained: "Due to the fact that all assets of CCM are still subject to the BK lien, CCM cannot allow the assets to be transferred . . . for no value. (Edict from the trustee — not from CCM). The trailers are valued at $1800 each. If [Milner] wants to drive off the trailers she will need to remit . . . the fee." In response, Milner's counsel stated: "[This] is a game changer regarding the trailers." CCM's attorney then responded: "If [Milner] drops the appeal she can have the trailers as trustee's obligations will be terminated." This apparently referred to an appeal by Milner's parents (not Milner) in CCM's bankruptcy proceedings.

At trial, Milner's counsel attempted to admit the above e-mails into evidence. Milner testified CCM initially offered the trailers, which stored some of her property, for free if she relieved CCM of its storage obligations. She explained CCM later "reneged" and asked her to pay $1,800 for each trailer, and her counsel indicated she was not interested. Milner's counsel then asked about CCM's next proposal. It appears her counsel was seeking to elicit testimony about CCM's suggestion that Milner's parents drop the bankruptcy appeal in exchange for the trailers. CCM's counsel objected based on section 1152.

In a sidebar, CCM's counsel argued the April 2013 e-mails concerned an attempt by the attorneys to settle the parties' outstanding issues. He stated: "[N]egotiations [took] a hit because she can't get the trailers for free" so "the response from counsel for CCM [is] if she drops the bankruptcy appeal, which is keeping the bankruptcy in place — then she can have the trailer." CCM's counsel then argued the evidence was inadmissible under section 1152 because the parties should have been allowed to engage in settlement discussions "without that communication creating a basis for liability down the road." In response, Milner's counsel insisted the evidence had nothing to do with liability and related to CCM's statute of limitations defense. He also suggested the evidence would rebut CCM's assertions that it did not prevent Milner from retrieving her property.

The court ultimately excluded the evidence and found CCM's counterproposal that Milner's parents drop the bankruptcy appeal was not relevant. The court generally emphasized the bankruptcy matters were not relevant. To the extent they were relevant, the court held the probative value was substantially outweighed by the probability its admission would necessitate undue consumption of time or create undue prejudice, confusion of the issues, and misleading of the jury.

2. Analysis

Milner claims the court erred because section 1152 did not render the evidence inadmissible. She argues the latter statute "does not apply to situations [where] the conduct that occurred during the negotiations was tortious." According to Milner, CCM's refusal to return her property unless it received payment or her parents abandoned a pending appeal was an act of conversion. Contrary to Milner's assertion, the trial court did not exclude the evidence based on section 1152. Instead, the court excluded the evidence on relevancy grounds and based on section 352.

18

Even assuming the court erred by excluding the evidence, any error was harmless.  The April 2013 e-mails do not suggest CCM refused to return Milner's property.  Indeed, other evidence suggests CCM had been asking Milner to retrieve her property since 2012.  And the jury was allowed to hear Milner's testimony about CCM's initial offer to give her the trailers for free and its subsequent withdrawal of the offer and request for $1,800 per trailer.  Hearing additional testimony about offering the trailers for free if the bankruptcy appeal were dismissed would not have impacted the jury's verdict.  (*Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 963 ["[W]e . . . will not reverse the judgment in the absence of an affirmative showing there was a miscarriage of justice"].)

*Purported Error Regarding Expert Testimony Did Not Result in a Miscarriage of Justice*

Relying on *Kennemur v. State of California* (1982) 133 Cal.App.3d 907 (*Kennemur*), Milner contends the court erred by allowing CCM's expert, Edward Testo, to provide valuation opinions based on a "cost approach" methodology because he developed the opinions after his deposition, and she did not have an opportunity to examine him about those opinions.  In response, CCM argues Testo did not rely on the cost approach for his valuation opinions, Milner's counsel did not raise a timely *Kennemur* objection, and any error was harmless.  We agree there was no miscarriage of justice even assuming the court erred by admitting the testimony.

A.  Standard of Review and Applicable Law

"The overarching principle in *Kennemur* [and other cases] is clear:  a party's expert may not offer testimony at trial that exceeds the scope of his deposition testimony *if* the opposing party has no notice or expectation that the expert will offer the new testimony, or *if* notice of the new testimony comes at a time when deposing the expert is unreasonably difficult."  (*Easterby v. Clark* (2009) 171 Cal.App.4th 772, 780.)

19

"We review a trial court's decision to admit expert testimony for an abuse of discretion. [Citation.] An abuse of discretion occurs only if "'the trial court's decision exceeds the bounds of reason and results in a miscarriage of justice.'"" (*Lurner v. American Golf Corporation* (2023) 97 Cal.App.5th 121, 137-138.)

### B. Disputed Testimony

In arguing Testo improperly testified about the cost approach, Milner points to the following example of his testimony: "Q[:] From a cost approach — a cost-based approach, did you — do you have any opinions about the fair market value of the property that was listed in this missing and damaged list?" "[A]: I do have an opinion on 92 of the 211 items in that exhibit that relate to that, but they require a little more of an explanation as to what that opinion is and how it's formulated."

Milner's counsel objected and requested a sidebar. He argued Testo's testimony about the cost approach went beyond his deposition and requested the court strike the testimony. The court asked the basis for striking the testimony, and Milner's counsel stated: "You are right. I don't have a motion before your honor."

After Testo completed his entire testimony, Milner's counsel later asked to be heard on a *Kennemur* objection. He argued Testo rendered valuation opinions that were not disclosed during his deposition and conducted post-deposition research to support his opinions. He further noted he had asked Testo during his deposition if he expected to do any further work before trial. Testo allegedly stated he did not expect to do further work unless he was requested to do "'more work data services from client.'" Milner's counsel concluded by asking the court to strike Testo's testimony or instruct the jury to consider the post-deposition opinions in assessing credibility.

The trial court denied Milner's request and held her counsel had not asked the appropriate questions at Testo's deposition to lay the foundation for a *Kennemur* objection. The court explained: "[Testo] said at first he did not expect to do any more hours of work other than maybe trial preparation, unless he got requested to do more work, data services from my client. [¶] *Kennemur* and it's progeny then at that time it would behoove counsel to then say, 'Well, okay, if you are requested to do more work or data services, you are to . . . have . . . defense counsel inform me' . . . 'of this additional work as soon as possible.'"

Assuming it was error to permit Testo to testify on the above issues, we may reverse only if the error resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13; § 354.) A miscarriage of justice occurs when there is a reasonable chance a result more favorable to the appealing party would have been reached. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.) We do not believe that to be the case here. Testo was CCM's damages expert and offered opinions on the fair market value of Milner's property given Milner's allegation that she had incurred economic losses from her damaged or lost property. The jury returned a special verdict, finding CCM had not breached any contract or converted Milner's property. In other words, the jury found no liability. Because Testo's opinions pertained only to the calculation of damages and the jury did not reach the damages issue, any error in the admission of Testo's testimony did not result in a miscarriage of justice.

*Cross-appeal: The Court Erred by Finding CCM's Declaratory Relief Claim Was Time-barred*

CCM cross-appeals from the court's order granting Milner's motion for summary judgment on its first amended complaint. The cross-appeal only concerns the court's holding that CCM's declaratory relief claim was barred by the statute of limitations. According to CCM, the court erred because there is an ongoing controversy

21

between the parties about CCM's duty to continue storing Milner's property. CCM also argues its declaratory relief claim alleges something akin to a continuing nuisance or continuing trespass claim for which no statute of limitations has expired. CCM notes it is still incurring costs to store Milner's property and emphasizes it repeatedly informed Milner to retrieve her property in 2012 through 2017. While CCM argues it terminated any storage agreement given its communications in 2012 through 2017, it does not want to dispose of Milner's property absent a court declaration regarding the parties' rights and duties. We agree CCM's declaratory relief claim is not time-barred.

### A. Standard of Review

Whether an action is barred by the statute of limitations is a question of fact unless the facts are undisputed, in which case the issue may be decided as a matter of law. (*Jolly*, *supra*, 44 Cal.3d at p. 1112.) An appellate court also reviews a grant of summary judgment de novo, "considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained." (*Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 334.) The motion shall be granted if "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion . . . ." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)

### B. Statute of Limitations

As discussed *ante*, the trial court found two possible statutes of limitations applied to CCM's declaratory relief claim: (1) four years under Code of Civil Procedure, section 337, subdivision (a) assuming the claim was based on CCM's "obligations founded upon" the Settlement Agreement; or (2) three years for a gratuitous bailment.

22

The court then concluded the action was time-barred because CCM filed the action in 2017 — more than four years after it was aware of facts starting the statute of limitations in 2006 and no later than June 25, 2012, when its counsel sent a letter to Milner's attorney demanding she remove her property.

The court erred because CCM sought a judicial declaration in connection with its continual storage of property against its will and at its own expense. In other words, CCM's claim alleged something more akin to a continuing nuisance or continuing trespass by Milner given her refusal to take possession of her property. Indeed, CCM's complaint alleged: "Based on [CCM's] . . . notice[s] of termination and [Milner's] unreasonable delay in retrieving the Stored Play Items, [CCM] contends it may now dispose of the property with no obligations to [Milner]" but "[Milner] disagrees with this." The complaint also alleged: "Since 2012, CCM has repeated its demand for [Milner] to retrieve the Stored Play Items . . . ." "Where a continuing nuisance is alleged, every continuation of the nuisance gives rise to a separate claim for damages caused by the nuisance." (*Mangini v. Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125, 1143.) "[I]f the nuisance may be discontinued at any time it is considered continuing in character. [Citations.] Every repetition of a continuing nuisance is a separate wrong for which the person injured may bring successive actions for damages until the nuisance is abated, even though an action based on the original wrong may be barred." (*Phillips v. City of Pasadena* (1945) 27 Cal.2d 104, 107-108.) Likewise, "[c]ontinuing trespasses are essentially a series of successive injuries, and the statute of limitations begins anew with each injury." (*Starrh & Starrh Cotton Growers v. Aera Energy LLC* (2007) 153 Cal.App.4th 583, 592.)

For the foregoing reasons, the statute of limitations has not expired on CCM's declaratory relief claim because "every continuation of the nuisance gives rise to a separate claim . . . ." (*Mangini v. Aerojet-General Corp.*, *supra*, 230 Cal.App.3d at p. 1143.)

23

DISPOSITION

The judgment is reversed, and the matter is remanded with directions that the trial court enter an order denying Milner's motion for summary judgment on CCM's declaratory relief cause of action. In all other respects, the judgment is affirmed. CCM shall recover its costs incurred on appeal.

SANCHEZ, J.

WE CONCUR:

GOETHALS, ACTING P. J.

GOODING, J.